## UNITED STATES v. RUTKIN.

### No. 10320.

United States Court of Appeals
Third Circuit.

Argued April 19, 1951.

Decided May 23, 1951.

Rehearing Denied June 19, 1951.

Hastie, Circuit Judge, dissented.

**432**

Jack L. Cohen, Newark, N. J., for appellant.

Charles J. Tyne, Asst. U. S. Atty., Newark, N. J., Theron Lamar Caudle, Asst. Atty. Gen., Turner L. Smith, Ellis N. Slack, Meyer Rothwacks, Sp. Assts. to Atty. Gen., Grover C. Richman, Jr., U. S. Atty., Newark, N. J., for appellee.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant was convicted of wilfully attempting to defeat and evade income and victory taxes.[1] He claims error by the trial court in the charge; in refusing to grant his motion for judgment of acquittal; and in connection with certain defense testimony.

Admittedly the sum of $250,000 was paid appellant by one Reinfeld. It was charged that the payment was made as the result of extortion. Appellant contended that it was in final settlement of his asserted interest in Browne Vintners Company and therefore not reportable income by him because the corporation had already paid the capital gains tax on the money.

Reinfeld, the principal Government witness, testified that in 1926, during the prohibition era in this country, he and five other men were engaged in what he called a "High seas venture". This was a bootlegging operation which, as de-

---

1. The indictment was founded on Section 145(b) of the Internal Revenue Code, 26 U.S.C.1946 ed. § 145(b), which reads: "Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

scribed, consisted in putting "a boat out there beyond 12-mile limit and different people come and buy whiskey. We only sold it to boats with foreign registration." The enterprise continued until 1932. In 1929 appellant came into the group. According to Reinfeld appellant did not contribute any money, "He just wanted to be a partner and we took him in." Asked the reason for so doing, Reinfeld said, "Well, we were afraid that we will get some interference and trouble." Later he gave as the reason "Because we were afraid of him" and repeated, "If we didn't take him in, we would have probably encountered some trouble."

Reinfeld testified that Rutkin was to receive 3% of the profits. A few month's later, said Reinfeld, one of the other members of the organization "said he was going to quit because he had some arguments with Rutkin and he is afraid". The person did quit and gave his 3% share to Rutkin. In 1930 another group, consisting of Abner Zwillman, Joseph Stacher, Joseph Davis, Harry Davis and two others, purchased 50% of the enterprise. The undertaking was liquidated in 1933 and there was an accounting "as to what each partner had." Reinfeld stated that not only was nothing coming to Rutkin but that he was $35,000 overdrawn. He went on to say that in October 1933, the members of the original venture, with the exception of Rutkin, organized the Browne Vintners Company. In 1940 this was sold to Distillers Seagrams, Ltd. for seven and a half million dollars. Reinfeld's testimony is to the effect that Rutkin never had any interest in Browne Vintners. In 1936, Reinfeld stated that Rutkin asked him for $60,000 saying that he had 6% in the old company and that he still had 6% in Browne Vintners. Reinfeld testified that he answered, "Jim, you haven't got any money." Reinfeld said that, nevertheless, he gave him the $60,000 because he liked him and because Rutkin had convinced him that "He is going to be a success." At that time Rutkin signed a document which, among other things, stated that he sold, signed and transferred to Reinfeld all

of his "* * * right, title and interest in and to six percent of the issued and outstanding shares of capital stock, preferred and common, as of October 1, 1936, of Browne Vintners Co., Inc., a New York corporation, which represents any and all of such shares of capital stock in the said Browne Vintners Co. Inc., that I am entitled to." As to this, Reinfeld testified that Rutkin delivered it to him saying that "* * * he was paid out in full according to what claims he was making and I decided to recognize the claims and pay him out in full." In 1939, Reinfeld obtained a job for appellant with Browne Vintners at $15,000 a year. Rutkin stayed in this from six to eight months. During that period, as Reinfeld narrates it, Rutkin was in trouble in Boston and Reinfeld paid a lawyer named Kessler $2500 to help him or for helping him. Rutkin lost his job because of the Boston incident. About a year later Reinfeld saw him and gave him $2,000 or $3,000 to help him out.

Reinfeld said that in 1941 he gave appellant $10,000 on representations from the latter that he wished to purchase a tavern. Rutkin came back in a week or ten days for more money and at that time Reinfeld accused him of losing the $10,000 at the race track. "And that was our first trouble", says Reinfeld. There was an argument and Reinfeld told Rutkin that he was not going to give him another cent; that he was finished.

Reinfeld testified that in late October or early November 1942 Rutkin came to his office at Browne Vintners and started off by saying to him, "Where is my money? * * * You all done well, you all made a lot of money, what about me?" Reinfeld states he answered, "What do you want from me now that you threw all your money away? I haven't got your money." Rutkin insisted that Reinfeld give him $100,000 to pay his debts. There was an argument and Reinfeld said that Rutkin threatened him. Asked to tell about this in detail Reinfeld said, "Well, he had his hand in his pocket (indicating) and said that he would kill me if I did not give him the money in three days." Then, said Reinfeld, Rutkin "run out". Reinfeld

stated that because of the incident he cancelled some appointment that he had and that he "was disgusted and discouraged with business and everything."

A couple of weeks later Rutkin again came in to Reinfeld's office, pushed the latter's secretary aside, and told Reinfeld "That if I don't give him that money that he is going to kill me." At that time Rutkin's demand went up to $150,000. Reinfeld was then asked, "What happened to you about this time, if anything?" He answered, "Well, I took sick."

A week or two later Rutkin came to Reinfeld's New York hotel room and saw him there. Reinfeld said he doesn't remember what Rutkin said but that it was "nothing bad". As Rutkin was leaving, Reinfeld followed him to the door and then, Reinfeld states that Rutkin "opened the door and started to walk out. He turned around and put a gun on me saying 'you get well and give me that money'". At that time his figure was $200,000. He said, "Get me $200,000 or I will kill you." Sometime later, no specific date being fixed, at a time when Reinfeld states he was just getting well, his testimony is that Rutkin telephoned him, told him he was sick and started to apologize. Rutkin sounded over the telephone as though he were crying. Reinfeld says that he felt badly about this and agreed to go to Rutkin's hotel to see him. He did go to the hotel. He states that Rutkin told him that he had not slept since he had been up to see Reinfeld and that Rutkin said further that he must have been crazy or something. Reinfeld stated that he felt very sorry for Rutkin and said, "Let's forget the whole thing." Rutkin told him that he owed $4,000 for room rent and some other things and asked him for money. Reinfeld went out and obtained $5,000 and brought it back to him. Then, says Reinfeld, "* * * he told me if I could only give him another $5,000, how much he will think of me and all that. So I gave him another $5,000 at about 5 or 6 o'clock that afternoon."

Within a month, at the home of his brother-in-law, Reinfeld saw Rutkin again. Reinfeld's story is that he expected to there meet Zwillman's group and settle some disputed money matters with them. Rutkin was present with that group. The dispute with the group was quietly disposed of by agreeing to pay Zwillman $358,000. Then Kessler, the above referred to attorney, who was also present and who had handled the settlement of the dispute, asked about Rutkin. Reinfeld states that he asked what was Rutkin's claim and that Kessler replied that Reinfeld and Rutkin had been friends a long while and told Reinfeld to "give him some money and get through with it". Reinfeld and Rutkin went into another room. Reinfeld states that Rutkin, at first, wanted half a million dollars and finally said that he would take $250,000. Reinfeld explains agreeing to this by saying, "I wanted to get rid of him anyway and get this off my mind because I carried it long enough. I was a sick man so I agreed". Reinfeld, his brother-in-law, and a third person, obtained both the settlement money for Zwillman and the cash for Rutkin from two safe deposit boxes and thereafter the $250,000 was given Rutkin. Reinfeld said that the money was paid Rutkin because of Rutkin's above described course of conduct in which he had threatened to kill Reinfeld if the latter did not give him first, $100,000, then $150,000 and $200,000, then up to $500,000 and that the $250,000 was a compromise figure. The cash was actually paid over to Rutkin May 11, 1943 in exchange for a general release from him in favor of Reinfeld, the latter's brothers, Browne Vintners Co., Inc., and others.

■ Appellant's first point concerns that part of the charge when the District Judge instructed the jury that "If that money was extorted and was paid as the result of threat, then it was taxable income and Rutkin was under the duty of reporting that tax." It is urged that the Court failed to define the word "extortion" and that this is reversible error "* * * because the Court thereby failed in its duty to charge all the material elements of the offense."

Appellant cites as supporting his proposition, Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495; Unit-

ed States v. Noble, 3 Cir., 155 F.2d 315; United States v. Max, 3 Cir., 156 F.2d 13; United States v. Levy, 3 Cir., 153 F.2d 995. Those decisions are not in point on the particular problem. Extortion was not the offense for which appellant had been indicted and tried. It was merely the method allegedly employed by Rutkin to obtain the $250,000 and Reinfeld was explicit in his testimony that his payment to Rutkin "was the result of extortion" and in detailing the facts to show just what he meant by the use of that term. Appellant's story that he received the $250,000 to close out his share in the "High seas venture" which he contended had carried over into the Browne Vintners Company, was also in evidence and before the jury. The record fails to reveal the slightest reason for inferring that the jury could have possibly misunderstood the clear language of the charge which precisely outlined the contradictory versions of the circumstances under which Rutkin received the money and their effect, if believed, upon the basic question at issue, namely, the guilt or innocence of the defendant under the indictment. Cf. Graham v. United States, D.C. Cir., 187 F.2d 87, 90.

Appellant then advances to what is his main argument on this phase of the appeal. He asserts that the above quoted sentence from the charge is error because, under the circumstances as there outlined by the Court, the $250,000 received by Rutkin was not taxable and there was no necessity for showing its receipt in Rutkin's income tax report. The Supreme Court opinion in Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 is offered as upholding this theory. That decision held that embezzled money does not constitute taxable income to the embezzler. In Wilcox it was conceded

that the sum in question had been embezzled by the defendant who had been convicted of that offense in a state court. The employer at all times held the embezzling employee-taxpayer liable to return the full amount of money he had wrongfully taken. All right, title and interest in the money rested with the employer. The Court held that a taxable gain under Section 22(a) of the Internal Revenue Code[2] is conditioned upon (1) the presence of a claim of right to the alleged gain; and (2) the absence of a definite unconditional obligation to repay or return that which would otherwise constitute a gain.

As to the first condition, Reinfeld, according to the record, never denied the presence of a claim of right by Rutkin to some money. He had, some time previously, taken a release from Rutkin of the latter's alleged share in Browne Vintners when he gave him the $60,000. According to the evidence, the figure of $250,000 was, itself, a compromise of Rutkin's later demands. Rutkin at various times asked for different amounts ranging from $100,000 to half a million dollars but what he was seeking, according to his testimony, was what he called, "my money". He had expressly asserted that his interest in the "High seas venture" had carried over into Browne Vintners. And he gave a general release in favor of Reinfeld and Browne Vintners at the time he was given the $250,000. So he did receive the money with a *semblance* of a bona fide claim of right" as the embezzler had not in Commissioner of Internal Revenue v. Wilcox, supra, 327 U.S. at page 408, 66 S.Ct. at page 549. (Emphasis supplied).

The Wilcox decision is founded upon the opinion of Mr. Justice Brandeis in North American Oil Consolidated v. Bur-

2. The pertinent part of Section 22(a) of the Internal Revenue Code, 26 U.S.C.A. § 22(a), is as follows:
  "§ 22. Gross income
  "(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades,

businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived *from any source whatever*." (Emphasis supplied.)

net, 286 U.S. 417, at page 424, 52 S.Ct. 613 at page 615, 76 L.Ed. 1197, which holds: "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." The recent Supreme Court opinion in United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 523, speaking of the above holding in North American Oil Consolidated, said, "Nothing in this language permits an exception merely because a taxpayer is 'mistaken' as to the validity of his claim."

Regarding the second condition indicated by the Wilcox opinion as necessary to defeat a taxable gain, namely, the presence of a definite unconditional obligation by Rutkin to repay or return the $250,000 to Reinfeld, there is not the slightest hint in the record that Rutkin ever had or has such obligation. Reinfeld, after agreeing to give the $250,000 to Rutkin, did cause that sum to be turned over to him and took from him a general release. Reinfeld, the owner of the funds, participated in what he designates as their misappropriation by his own conscious acts. Obviously, as a result of that transaction, Rutkin at that time possessed a colorable claim of title to the money. This has never since been challenged. Reinfeld has unmistakably considered the $250,000 to be Rutkin's property. He has left Rutkin in undisputed possession of it for the last eight years and has permitted the statute of limitations[3] to expire on whatever right he might have had to reclaim the money. Cf. Akers v. Scofield, 5 Cir., 167 F.2d 718, certiorari denied 335 U.S. 823, 69 S.Ct. 47, 93 L.Ed. 378.

Therefore, under the Wilcox test, narrow as that test might possibly seem at this time and under current conditions, there was evidence from which the jury could find that the $250,000 was taxable income to Rutkin and should have been so reported by him. As the Wilcox opinion, 327 U.S. at pages 408–409, 66 S.Ct. at page 549 points out, *"The question, rather, is whether the taxpayer in fact received a statutory gain, profit or benefit.* That the taxpayer's motive may have been reprehensible or the mode of receipt illegal has no bearing upon the application of Section 22(a). * * * *In each instance the taxability is determined from the circumstances surrounding the receipt and holding of the money"*. (Emphasis supplied.)

One other thought prior to leaving the Wilcox decision. The majority opinion there states that if the embezzler had used the embezzled money " * * * and obtained profits therefrom such profits might have been taxable regardless of the illegality involved." The opinion goes on to say 327 U.S. at page 409, 66 S.Ct. at page 549: "Or had his employer condoned or forgiven any part of the unlawful appropriation the taxpayer might have been subject to tax liability to that extent. But neither situation is present in this proceeding and we need not explore such possibilities."[4] Here, however, entirely aside from the facts fulfilling both Wilcox conditions there exists the plain inference of condonation or forgiveness of all of the unlawful appropriation. This alone, under the above suggestion and having in mind all of the circumstances involved in this appeal, is enough to defeat the contention that as a matter of law appellant's conduct as charged did not constitute an indictable offense. See GCM 24945, CB 1946–2 p. 27.

3. N.J.S.A. 2:24–1.

4. Humphreys v. Commissioner of Internal Revenue, 7 Cir., 125 F.2d 340, is the closest decision to the instant facts which we have seen and supports the view here expressed. In that suit there was testimony to show that the taxpayer was generally regarded as a gangster and racketeer and that he had not been engaged in any legitimate business. The Board of Tax Appeals was affirmed in including in his taxable income $10,000 protection payments received by him from dry cleaners and $50,000 ransom money received by him from representatives of a kidnapped labor leader. The Supreme Court denied certiorari, 317 U.S. 637, 63 S.Ct. 28, 87 L.Ed. 513.

■ The taxability of the $250,000 is in complete accord with the plain meaning of the statute. Section 22(a) reads that gross income includes "gains, profits, and income derived from * * * the transaction of *any* business carried on for gain or profit, or gains or profits and income derived *from any source whatever.*" (Emphasis supplied.) Prior to the 1916 amendment "any business" in the above clause read "any lawful business". As Mr. Justice Burton points out in his Wilcox dissent, 327 U.S. at page 411, 66 S.Ct. at page 550, "The 1916 amendment demonstrated an intent to include gains, profits and income from any unlawful business as well as from any lawful business." It is noteworthy that in that same dissent, 327 U.S. page 414, 66 S.Ct. 551, appears the following: "If he [the taxpayer] had gained possession of the original funds by *extortion,* fraud, or usurious practices, those gains would be taxable to him under the general language of § 22(a)." (Emphasis supplied.) [5]

Appellant also contends that the Court's refusal to charge defense request 29 was reversible error. The request reads: "29. It is admitted that the capital gains tax on the sale of all of the Browne Vintners stock was paid, and, therefore, if the money which Rutkin received came to him as a result of his interest in Browne Vintners stock, it was not taxable, he was under no obligation to report it in his income tax return for 1943, and he must be acquitted. Even if you believe Rutkin made threats to Reinfeld and that these threats produced the money, if the money was in payment of Rutkin's interest in the Browne Vintners stock, he should be acquitted."

The Trial Judge refused to charge this in the requested language and other than as he had charged. No exception by the defense to the Court's refusal to charge request 29 as presented appears on the record. At the time exceptions were taken, the defense attorneys may have mistakenly assumed that an exception had been noted to the Court's refusal to charge request 29 as submitted. This may have resulted in inadvertent omission by appellant's attorneys to note such exception. We will consider the argument on its merits.

■ There is no difficulty as to the first sentence of the request. That constituted Rutkin's sole defense theory. It, together with the Government's contention, was charged by the Court as follows: "But then we come to the admitted payment of $250,000. Rutkin says that that $250,000 was a final settlement of his claim in Browne Vintners, and if that is so—and the government does not contend that the capital gains tax was not paid—he would not be obliged to report that income. But Reinfeld says no, 'that was the result of extortion. He got that money out of me by threatening me and my family', and he told the instances where those threats were made."

In so charging, the Court correctly outlined the Government and defense theories of the case on which the entire trial had been based. The remaining sentence of the request was palpably improper. The defense had never alleged, and does not so allege down to this moment, that Rutkin, though legally entitled to the $250,000, had threatened to kill Reinfeld in order to obtain it and that he had actually thus obtained it. That idea had not been advanced, or in the slightest manner intimated, until it was for the first time suggested in request 29. There is no pretense that there was any mention of it by either the defense or the Government attorneys in opening or closing arguments to the jury. There is not one word concerning it in the voluminous record other than as outlined in the second sentence of request 29. Rutkin's whole defense was that he was entitled to some amount greater than $250,000 as his share of Browne Vintners and that he had reluctantly accepted such sum from Reinfeld in settlement of his claim at Reinfeld's urging. It is true, of course, that the Government had produced evidence to show that Rutkin had forced Reinfeld under threat to kill to give him money not rightfully his. It is also true that, according to Rutkin, he was peaceably paid

5. See Estate of Nitto, 13 T.C. 858, 866–867.

$250,000 by Reinfeld in satisfaction of a claim worth more. But there is no evidence that Rutkin obtained his rightful money by threatening to kill Reinfeld. That is a new issue and one which was never tried under the indictment before us. It creates a new defense, a vital part of which (the threats) Rutkin, himself, denied under oath at his trial below.

■ Appellant, by the second sentence of the request, sought to have the jury decide the case on an issue which had never been before it. That part of the request was rightfully refused. Cf. Battle v. United States, 209 U.S. 36, 38, 28 S.Ct. 422, 52 L.Ed. 670; Bird v. United States, 187 U.S. 118, 132, 23 S.Ct. 42, 47 L.Ed. 100; Bakotich v. United States, 9 Cir., 4 F.2d 386, 387. In Kleibor v. Colonial Stores, Inc., 4 Cir., 159 F.2d 894, the attempt was made by plaintiff's attorney to take disconnected bits of testimony of the plaintiff Kleibor and from them construct a request to charge which would have presented to the jury a theory of the accident involved which had been expressly repudiated on the witness stand by the plaintiff. The refusal to charge the request was upheld on appeal, with the Court saying 159 F.2d at page 896: "Counsel cannot marshal some of Kleibor's statements, to the exclusion of others, and construct a story which is not only different from Kleibor's but one in which, by these same remarks, he unequivocally rejected the possibility now suggested."

Appellant's next point involves his exception to that part of the Court's charge which stated: "There has been some testimony here about evidence given by witnesses in other courts or in other trials or proceedings antecedent to trial, such testimony having been sworn. I believe that one of the witnesses said, 'yes, he told a white lie.' But I know of no dictionary or no classification which would make perjury a white lie; and I don't care whether that perjury was committed to help a friend or not, because if you help a friend by perjury, what do you do to yourself? Who knows? But if you believe that any witness at this trial lied in any respect, then you are free to reject all of the testimony of that witness or any part of it. It doesn't mean, if you believe he lied in one instance, that you must necessarily believe that he lied in all instances, because you must apply to every bit of the testimony your test of truth. So the fact that a witness lied in one respect doesn't, as I say, necessarily mean that he lied all the way through but is something for you to consider in determining what credibility you will give to the rest of that person's testimony; and that goes for every witness that appeared before you."

The defense attorney excepted as follows: "Now then I desire to take an exception to that part of your Honor's charge which said, "If you believe the witness lied, you may disregard all of his testimony." The Court then further charged the jury as follows: "Counsel has said to me that I told you that if you believe the witness lied in any respect you might disregard all of his testimony. What I had in mind is that if you find that he lied you may accept or reject such testimony as you believe to be false or true, accept the true and reject the false and if you had any other impression, please correct it to that extent."

No exception was taken to that further charge. Appellant insists that it is, in effect, the same as the original instruction. This is incorrect. There is a distinct difference between the two. By the corrective charge the Court withdrew from the jury the authority given it in the original instruction to reject *all* testimony of a witness who it believed "had lied in any respect". The second charge precisely told the jury that even in those circumstances that body could accept or reject testimony of the witness as it believed such testimony to be true or false.

On the merits of the argument appellant maintains that the Court, by so charging, misapplied the false in one, false in all doctrine; erroneously singled out Rutkin; and destroyed his competency as a witness.

Rutkin's defense to the indictment was that Reinfeld had given him the $250,000 in payment of his partnership interest in Browne Vintners. While his explanations of the extent of his interest in that venture

varied, he did testify on both direct and cross examination that Zwillman and Stacher came into the concern as partners in 1930 and on cross examination he did say that his percentage was about 13¾% after the advent of Zwillman. Later on cross examination he was questioned concerning testimony he had previously given under oath at a liquor license hearing in New York where he said he had not been in business with Zwillman or associated with him at all in any enterprise. Confronted with this he said, "I told a white lie over there." On his own admission the two statements were not mere contradictions. He had lied in one or the other. In New York, according to him, he had lied to protect "a friend's liquor license." At this trial his diametrically opposed testimony was material as part of the defense proof to establish him as a partner in Browne Vintners with a right to the $250,-000 in settlement of his interest and, consequently, to be acquitted of the charge in the indictment.

▆ With that trial situation in mind, we find no substantial error in the corrective charge. A conscious falsehood upon a material point was involved. Even if the lie had concerned some minor trial item we would be inclined to agree with Professor Wigmore that "In the nature of character, a person who would lie upon a collateral point is perhaps likely to be a more determined liar than one who dares it only upon a material point; at any rate there is no less a call to distrust the former than the latter." Wigmore on Evidence, 3rd Ed. Section 1014. In telling the jury that " * * * if you find that he lied you may accept or reject such testimony as you believe to be false or true, accept the true and reject the false and if you have any other impression, please correct it to that extent.", the Court was " * * * merely * * * [telling] the jury what they may do in any event, not what they must do or must not do, * * *." Wigmore on Evidence, 3rd Ed. Section 1008.

And see Jones Commentaries on Evidence, 2nd Ed. Section 2473. Cf. Schneider v. United States, 3 Cir., 57 F.2d 454, 456-457.

Nor do we think that what the Court said, above quoted, was erroneous from the view of prejudicial comment or that it destroyed appellant's competency as a witness.[6] The incident did not involve a conflict of testimony on a hotly contested question of fact as in Virginia Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, cited by appellant. It arose simply because Rutkin had made two flatly opposed statements under oath which were on a material point. Rutkin, himself, selected his New York testimony as the lie—"white lie" he called it. There was no unfair stressing of the episode. The Trial Judge quite properly referred to it in the charge but in his statement of the false in one, false in all rule he did not confine that rule to the defendant. He said, "That goes for every witness that appeared before you." After strongly charging presumption of innocence and reasonable doubt and throughout the charge reiterating that the jury was the sole judge of the facts and of the credibility of witnesses, the Court towards the end of the charge said specifically regarding appellant: "James Rutkin as a defendant at this bar of justice is entitled to every protection that the law gives him. I have tried to point them out to you and to stress them. None of these protections may be taken from him. The presumption of innocence goes with him all the way through the trial right down to the last moment of your deliberations and can be taken from him only by a verdict of guilty should you believe that the government has proven his guilt beyond a reasonable doubt. It is a real protection and it is something that you must be very careful of. Everything that I have pointed out that safeguards his liberty it is your bounden duty to keep in mind."

Appellant also claims that the Trial Judge improperly impugned the testimony of important witnesses for the defense in

6. The fact that earlier in his charge the Trial Judge had told the jury that appellant had a strong interest in the outcome of the case but, again, unmistakably leaving his credibility to the jury was free from error. Cf. Freedman v. United States, 3 Cir., 274 F. 603.

the following incident. Harry Davis and his brother, Joseph, both of whom had been members of the "High seas" combine and the later Browne Vintners, were defense witnesses. Harry testified after Joseph and on cross examination was asked whether, while he was in the liquor business after 1940 under the name of Capital Wines and Spirits, he had "a license revoked". The question was objected to with the request that it be stricken. The Court said: "Well, I frankly am not impressed by this witness or his brother, and I will not strike it from the record; I think that he is using a subterfuge of saying I don't remember. As far as the particular question is concerned, I don't see the materiality, and that is the only reason I will strike it."

Exception was taken to the Court's statement and the Court said: "I am stating my opinion of this witness. * * * From his remarks on the stand."

Our own examination of the testimony of these witnesses reveals them to have been palpably evasive in their answers regarding their "investment" and its results in the mentioned operations. Both of them stated that they could not remember how much they had invested or how much they had realized. After several such answers the Court had cautioned Joseph that he was testifying under oath. A little prior to the statement of the Court to which exception was taken, Harry had said he couldn't remember whether he and his brother had entered the arrangement at the same time as Zwillman and Stacher. Immediately thereafter, in answer to the Court's query he said it was at the same time. Following that he said that he did not remember how much he had put into the "so-called Reinfeld Company", how much he got out of it, or how much he received in any one year from it.

■ The episode reveals ample justification for the Trial Judge's statement of his personal reaction to these witnesses from their testimony. The Court, in the excepted to statement, was advising the defense attorney of this in the course of explaining his decision on the request to strike the question. Considering the circumstances, there was nothing improper in the Judge's language. In the charge, the Judge, in careful, understandable detail, instructed the jury that "the problem of determining the truth in the conflict of evidence was solely and peculiarly yours. And it is a province which may not be trespassed upon by anybody, *not by the court,* not by counsel for the defense, not by counsel for the prosecution. You have the right to say what degree of credibility you will give to any of the testimony which has been given here. You have the right to consider the way in which the testimony was given and ask yourselves whether or not you believe that the persons giving the testimony told it in the manner of a straightforward, truth-telling person." (Emphasis supplied). In addition, the Trial Judge instructed the jury with reference to his trial rulings as follows: "During the course of the trial the court has made certain rulings but those rulings are in no way to affect you, because I was passing on questions of law. I was not attempting in any way to indicate what my belief was about any particular matter, because, as I have told you, you are the sole judges of the facts."

■ We are satisfied that there is no substantial merit to this contention of appellant. As was said in Daniels v. Goldberg, 2 Cir., 173 F.2d 911 at page 917: "But a federal trial judge is not precluded from explicitly saying to a jury that he disbelieves a witness, provided the judge also states that the determination of the facts is for the jury." See also United States v. Curzio, 3 Cir., 170 F.2d 354, 357; United States v. Chiarella, 2 Cir., 184 F.2d 903, 908.

■ Lastly, the charge is objected to as argumentative, one-sided and prejudicial to the defendant. No such exceptions were taken to the charge. Indeed, immediately after its conclusion, the attorney for the defendant stated to the Court as follows: "As your Honor knows, we have been here for practically two full weeks. It has been a trial of some duration, I think some thirteen or fourteen hundred pages of testi-

mony. I just want to take this opportunity to express the gratification it was to have the opportunity to try this case in the manner in which it was tried, and *for the fair trial which we have been accorded.* Those exceptions which I have just taken to the charge I of course had the right to take. *During the course of the trial I think your Honor has treated both sides fairly and impartially.* There have been times when we have felt the full effect of the alertness of your Honor's mind, but I am sure it has applied equally to the District Attorney and myself. I think the most unusual thing in a trial that lasted this long, while there have been objections and your Honor has ruled on them, sometimes overruling, sometimes sustaining the objections, I think it is safe to say there are not half a dozen objections in the record up to the time of the exceptions to the charge. In fact I can only recall two or three, and I think that is an unusual situation. In all trials I have been in and I have participated in one or two, I don't recall such things happening. *It is a tribute to the manner in which the trial has been conducted."* (Emphasis supplied.)

Under the circumstances the point could be, and should be, ruled on at once adversely to appellant. However, again in order to avoid any possibility of serious, though unchallenged, error, we have examined the charge with the above complaint in mind. We find that it was concise, comprehensive and fair. The Trial Judge did tell the jury that "You are not deciding who is the bigger scoundrel, Reinfeld or Rutkin * * *." This occurred while the Court was impressing upon the jury that the case before it was not that of Reinfeld against Rutkin and advising that body just what the issue was. Also, taking a typical example of the objected to language, the District Judge, in going over the evidence, did refer to it as "this stinking recital"—a restrained statement of the brazen lawlessness which the trial testimony revealed. The Judge's language, in the instances complained of, was called for by the events necessarily described. It was not unjust to appellant.

There was sufficient evidence in the Government's case to warrant appellant's conviction under the indictment. The Trial Judge correctly refused to direct a judgment of acquittal. The factual issues were submitted to and passed upon by the jury without any error of substance arising. The judgment of conviction of the District Court will be affirmed.

HASTIE, Circuit Judge (dissenting).

I dissent.

It was the theory of the prosecution, borne out by the government's evidence, that Rutkin, by threats and show of force, compelled Reinfeld to pay him money, well knowing that nothing was due but couching his several menacing demands for various sums in terms of a general claim asserted in bad faith to some further distributive share on account of his one time interest in a certain business enterprise. The trial court instructed the jury that the fruits of such villainy would constitute taxable income. This court now approves that legal conclusion. However, I think disapproval is required by the reasoning of the Supreme Court in Commissioner of Internal Revenue v. Wilcox, 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752.

The Court reasoned in the Wilcox case and subsequently in United States v. Lewis, 1951, 340 U.S. 590, 592, 71 S.Ct. 522, that an embezzler is not required to report his misappropriation as taxable gain because he asserts no "bona fide legal or equitable claim" to it. The additional point is made in the Wilcox case that "a definite, unqualified obligation to repay or return" the wrongful acquisition prevents it from being taxable gain". 327 U.S. at page 408, 66 S.Ct. at page 549. To me this reasoning seems equally applicable to ransom money paid a kidnapper or, in this case, to the take of the more sophisticated extortionist who makes a patently spurious claim while frightening his victim into paying what both know is not owed.

In none of these cases is money obtained or retained under a bona fide claim of right. In none of them does the wrongdoer acquire even defeasible title to the

proceeds of his wrongdoing. It is true that the discovery of embezzlement is usually followed by an attempt by the lawful owner to recapture that which has been stolen while, in extortion, the fear which causes the owner to surrender possession often prevents him from attempting to reclaim his own. But these differences affect neither the owner's title nor the wrongdoer's bad faith.

Finally, it seems to me that Rutkin's alleged claim of right to some additional compensation does not help the government's case. Indeed, the contention of the prosecution and its proof that Rutkin was well aware that nothing was owed him leaves whatever Rutkin may have said about an unsatisfied obligation without significance.

It follows that the reasons assigned by the Supreme Court for placing embezzled funds outside the category of taxable gain are equally forceful with reference to such extortion as the government alleged and undertook to prove here, and that the judgment should have been reversed.