RUTKIN *v.* UNITED STATES.

No. 195.  Argued December 3, 1951.—Decided March 24, 1952.

*Jack L. Cohen* argued the cause for petitioner.  With him on the brief was *Edward Halle.*

*Irving I. Axelrad* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Acting Assistant Attorney General Slack* and *Lee A. Jackson.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The principal issue before us is whether money obtained by extortion is income taxable to the extortioner under § 22 (a) of the Internal Revenue Code.[1]   For the reasons hereafter stated we hold that it is.

The petitioner, Rutkin, was indicted under 26 U. S. C. § 145 (b) [2] for willfully attempting to evade and defeat a large part of his income and victory taxes for 1943.   He was charged with filing a false and fraudulent return stating his net income to be $18,966.64, whereas he knew that it was $268,622.04.   That difference, which would increase his tax liability from $6,843.93 to $222,408.32, was due largely to his omission from his original return

---

[1] "SEC. 22. GROSS INCOME.

"(a) GENERAL DEFINITION.—'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service . . . of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or *the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. . . .*" (Emphasis supplied.)   53 Stat. 9, 53 Stat. 574, 26 U. S. C. § 22 (a).

[2] "SEC. 145. PENALTIES.

.        .        .        .        .

"(b) . . . ATTEMPT TO DEFEAT OR EVADE TAX.—. . . any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."   53 Stat. 62–63, 26 U. S. C. § 145 (b).

of $250,000 received by him in cash from Joseph Reinfeld. The United States claims that this sum was obtained by petitioner by extortion and as such was taxable income. Petitioner contests both the fact that the money was obtained by extortion and the conclusion of law that it was taxable income if so obtained. He contends also that he did not willfully attempt to evade or defeat the tax. Petitioner was found guilty by a jury in the United States District Court for the District of New Jersey, fined $10,000 and sentenced to four years in prison. The Court of Appeals affirmed, one judge dissenting. 189 F. 2d 431. We granted certiorari, 342 U. S. 808, so as to pass upon the alleged conflict between that decision and the decision in *Commissioner* v. *Wilcox,* 327 U. S. 404.

The facts are unusual but there can be no doubt that, under the instructions given the jury, we must regard its verdict as reflecting its conclusion that the $250,000 was obtained by petitioner by extortion.[3]   There was substantial evidence supporting that result.   Reinfeld's first association with petitioner was in 1929 with several others in a bootlegging operation known as the "High seas venture."   It was accomplished through the use of a ship in the sale of whiskey at sea more than 12 miles from shore. Reinfeld testified that petitioner contributed no money to the enterprise but was taken in because Reinfeld's associates were afraid that otherwise they would get "in-

---

[3] The instructions included the following:

"That somebody lied and committed perjury is perfectly patent because contradictory stories have been told, and you must say where the truth lies; and the problem of determining that truth is solely and peculiarly yours. . . .

.          .          .          .          .

"But then we come to the admitted payment of $250,000.  *Rutkin says that that $250,000 was a final settlement of his claim in Browne Vintners, and if that is so*—and the government does not contend that the capital gains tax was not paid—*he would not be obliged to*

terference and trouble" from petitioner. His interest was recognized to be 6% but, when the venture was liquidated in 1933, he already was overdrawn and no distribution was made to him. Without including petitioner, the others then organized Browne Vintners Co., Inc., a New York corporation, to engage in the liquor business. In 1936 petitioner, without making an investment, claimed a 6% interest in Browne Vintners. Despite Reinfeld's denial of petitioner's claim, Reinfeld paid him $60,000 and took from him an assignment of "any and all of such shares of capital stock in the said BROWNE VINTNERS Co. INC., that I am entitled to." In 1940 all the Browne Vintners stock was sold for $7,500,000 to a purchaser who also assumed $8,000,000 of the company's debts. The shares of stock when sold stood in the names of, and were transferred by, "nominees" so as to conceal the identity of Reinfeld and the other beneficial owners. A capital gains tax upon the profits from these sales was paid by the respective nominees.[4] Petitioner was neither a stock-

---

*report that income.* But Reinfeld says no, 'that was the result of extortion. He got that money out of me by threatening me and my family,' and he told the instances where those threats were made. There is one piece of corroboration of that, and that is from one of the six or seven people who were present in Holtz's cellar. . . .

"*If that money was extorted and was paid as a result of threats, then it was taxable income and Rutkin was under the duty of reporting that tax. . . .*

.      .      .      .      .

". . . There is no contention here that the defendant didn't know he got the $250,000; *the whole point is whether he got it by extortion or whether he got it properly. If he got it properly the tax was already paid.*" (Emphasis supplied.)

[4] The United States concedes that although, on a strict construction of the Internal Revenue Code, it may be that the proceeds of the sales should have been reported by the beneficial rather than by the record owners, their failure to so report the proceeds does not provide a satisfactory basis for a charge against them of a willful attempt to evade and defeat the tax in violation of § 145 (b).

holder of record nor a beneficial owner of any of the stock of the company at any time.

In 1941, in response to petitioner's request, Reinfeld gave him about $10,000 to help buy a tavern. When petitioner used the money for other purposes Reinfeld refused to finance him further and his "trouble" with petitioner began. In 1942 petitioner again claimed that he had had an interest in Browne Vintners Company and that Reinfeld must give him $100,000 to help him pay his debts. Upon Reinfeld's refusal, petitioner threatened to kill him. From that time on, the record presents a lurid story of petitioner's unsatisfied demands upon Reinfeld for various sums up to $500,000, petitioner's threatening use of a gun and his repeated statements that he would kill Reinfeld and Reinfeld's family unless his demands were met. Finally, on May 11, 1943, in New Jersey, Reinfeld paid petitioner $250,000 in cash.[5]

Throughout this melodrama petitioner asserted that he was entitled to the payments he demanded from Reinfeld because of petitioner's alleged former interest in Browne Vintners Company. That interest never was identified by petitioner. Reinfeld and others testified positively that petitioner never had any such interest. Nevertheless, on May 11, Reinfeld handed to petitioner $250,000 in cash at the same time that Reinfeld paid $358,000 to Zwillman and Stacher representing their conceded interest in the proceeds of Browne Vintners stock. Petitioner, with Zwillman and Stacher, thereupon signed a "general release." It did not state the amounts paid but it did

---

[5] Reinfeld testified:

"Q. And did you think that their [your family's] lives were in danger? A. I thought so, yes.

"Q. Did you do anything to protect their lives? A. I paid off.

"Q. You thought that would protect them from a gunning man? A. I hoped so."

purport to release Reinfeld, Browne Vintners Company and others from all claims the signers had against them.

Under the jury's verdict, we accept the fact to be that petitioner had no basis for his claim to this $250,000 and that he obtained it by extortion. Accordingly, if proceeds of extortion constitute income taxable to the extortioner, his omission of it from his tax return was unlawful. The further factual issue whether, under all the surrounding circumstances, petitioner's omission of the $250,000 from his tax return amounted to a willful attempt to evade and defeat the tax is not open to review here. That issue is settled by the verdict of the jury supported by substantial evidence.[6] It remains for us to determine the legal issue of whether money obtained by extortion is taxable to the extortioner under § 22 (a).

---

[6] That issue was presented to the jury in conformity with the views of this Court expressed in *Spies* v. *United States,* 317 U. S. 492, 499. The charge included the following:

"If that money was extorted and was paid as a result of threats, then it was taxable income and Rutkin was under the duty of reporting that tax. But as I indicated to you before, the mere failure to report it doesn't satisfy the requirements of the law with regard to the violation of this statute, there must be something else which will indicate the willful intent to defeat and evade the tax. You may consider other elements that appear in the evidence, the fact that this money was paid over in cash; that no record of any kind was made of the receipt of that money; that the money was split and $100,000 of it sent to the sister-in-law of the defendant to be placed in her vault or 'wault' as it has been called here, and that the other $150,000 was placed in the defendant's own vault. You may consider these as factors surrounding the whole transaction.

"Rutkin says that he kept no books; kept no books at that time nor at any other time; kept no books when he received his profit, sixty, seventy, eighty thousand dollars a year, I think it was, from the bootlegging, and admits that he paid no tax; kept no books when he got this $250,000. These are all things that you may consider as circumstances surrounding the whole procedure. The payment of $250,000 was made in the presence of other people, these people being Zwillman, as I recall it, and Stacher who were there with Rutkin

136

Under the instructions to the jury, extortion here meant that the $250,000 was paid to petitioner in response to his false claim thereto, his harassing demands therefor and his repeated threats to kill Reinfeld and Reinfeld's family unless the payment were made.[7] Petitioner was unable to induce Reinfeld to believe petitioner's false and fraudulent claims to the money to be true. He induced Reinfeld to consent to pay the money by creating a fear in Reinfeld that harm otherwise would come to him and to his family. Reinfeld thereupon delivered his own money to petitioner. Petitioner's control over the cash so received was such that, in the absence of Reinfeld's unlikely repudiation of the transaction and demand for

and the lawyers. Well, neither the lawyers nor any of these people, it seems to me, would be inclined to go out and publish it."

There is no suggestion that petitioner relied, at any time, upon any defense for his omission of the $250,000 from his tax return other than his false claim that it represented his beneficial interest in Browne Vintners stock and that the stockholding nominees had paid a capital gains tax on that interest when it was sold in 1940. When this claim was proved to have been false, and necessarily known by petitioner to have been false, that proof not only destroyed petitioner's claim to the money itself, but it also demonstrated the willfulness of his attempt to evade or defeat paying any tax on the $250,000.

[7] In the New Jersey statute, in effect in 1943, extortion was defined as follows:

"Any person who, with intent to extort from any person any money or other thing of value . . . shall directly or indirectly threaten to kill or to do any bodily injury to any man, woman or child unless a sum of money be paid, shall be guilty of a high misdemeanor and punished by imprisonment at hard labor for a term not exceeding thirty years, or by a fine not exceeding five thousand dollars, or both." N. J. S. A. 2:127–4.

See also, the federal statute, now in effect, relating to extortion affecting interstate commerce: "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 60 Stat. 420, 18 U. S. C. § 420e–1 (c).

the money's return, petitioner could enjoy its use as fully as though his title to it were unassailable.

An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. *Burnet* v. *Wells,* 289 U. S. 670, 678; *Corliss* v. *Bowers,* 281 U. S. 376, 378. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it.

Such gains are taxable in the yearly period during which they are realized. This statutory policy is invoked in the interest of orderly administration. "[C]ollection of the revenue cannot be delayed, nor should the Treasury be compelled to decide when a possessor's claims are without legal warrant." *National City Bank* v. *Helvering,* 98 F. 2d 93, 96. There is no adequate reason why assailable unlawful gains should be treated differently in this respect from assailable lawful gains. Certainly there is no reason for treating them more leniently. *United States* v. *Sullivan,* 274 U. S. 259, 263.

There has been a widespread and settled administrative and judicial recognition of the taxability of unlawful gains of many kinds under § 22 (a).[8]  The application of

---

[8] *Johnson* v. *United States,* 318 U. S. 189 (money paid to a political leader as protection against police interference with gambling); *United States* v. *Sullivan,* 274 U. S. 259 (illicit traffic in liquor); *Humphreys* v. *Commissioner,* 125 F. 2d 340 (protection payments to racketeer and ransom paid to kidnapper); *Chadick* v. *United States,* 77 F. 2d 961 (graft); *United States* v. *Commerford,* 64 F. 2d 28 (bribes); *Patterson* v. *Anderson,* 20 F. Supp. 799 (unlawful insurance policies); *Petit* v. *Commissioner,* 10 T. C. 1253 (black market gains); *Droge* v. *Commissioner,* 35 B. T. A. 829 (lotteries); *Rickard* v. *Commissioner,* 15 B. T. A. 316 (illegal prize fight pictures); *McKenna* v. *Commissioner,* 1 B. T. A. 326 (race track bookmaking).

138

this section to unlawful gains is obvious from its legislative history. Section II B of the Income Tax Act of 1913 provided that "the net income of a taxable person shall include gains, profits, and income . . . from . . . the transaction of any *lawful* business carried on for gain or profit, or gains or profits and income derived from any source whatever . . . ." (Emphasis supplied.) 38 Stat. 167. In 1916 this was amended by omitting the one word "lawful" with the obvious intent thereafter to tax unlawful as well as lawful gains, profits or income derived from any source whatever.[9]

There is little doubt now that where unlawful gains are secured by the fraud of the taxpayer they are taxable.[10] In the instant case it is not questioned that the $250,000 would have been taxable to petitioner if he had obtained it by fraudulently inducing Reinfeld to believe petitioner's false claims to be true. That being so, it would be an extraordinary result to hold here that petitioner is to be tax free because his fraud was so transparent that it did not mislead his victim and his victim paid him the money because of fear instead of fraud.

We do not reach in this case the factual situation involved in *Commissioner* v. *Wilcox*, 327 U. S. 404. We limit that case to its facts. There embezzled funds were held not to constitute taxable income to the embezzler under § 22 (a). The issue here is whether money extorted from a victim with his consent induced solely by harassing demands and threats of violence is included in the definition of gross income under § 22 (a). We think the power of Congress to tax these receipts as income

---

[9] For further discussion see dissent in *Commissioner* v. *Wilcox*, 327 U. S. 404, 410–411.

[10] For example, see *Akers* v. *Scofield*, 167 F. 2d 718. There the taxpayer swindled a wealthy widow out of substantial funds with which he was to conduct fraudulently represented treasure hunts. He was required to pay taxes on those funds.

under the Sixteenth Amendment is unquestionable. The broad language of § 22 (a) supports the declarations of this Court that Congress in enacting that section exercised its full power to tax income.[11] We therefore conclude that § 22(a) reaches these receipts.

We have considered the other contentions of petitioner but find them without merit sufficient to justify a reversal or remand of the case.

The judgment of the Court of Appeals accordingly is

*Affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE REED, MR. JUSTICE FRANKFURTER, and MR. JUSTICE DOUGLAS concur, dissenting.

In *Commissioner* v. *Wilcox*, 327 U. S. 404, decided February, 1946, we held that embezzled money did not constitute taxable income to the embezzler under § 22 (a) of the Internal Revenue Code. We there pointed out that the embezzler had no bona fide legal or equitable claim to the money, was under a definite legal obligation to return it to its rightful owner, and consequently had no more received the kind of "gain" or "income" which Congress has taxed than if he had merely borrowed money. One who extorts money not owed him stands in this precise situation. He has neither legal nor equitable claim to the extorted money and is under a continuing

---

[11] *Helvering* v. *Bruun,* 309 U. S. 461, 468; *Helvering* v. *Clifford,* 309 U. S. 331, 334; *Helvering* v. *Midland Ins. Co.,* 300 U. S. 216, 223; *United States* v. *Safety Car Heating Co.,* 297 U. S. 88, 93; *Douglas* v. *Willcuts,* 296 U. S. 1, 9; *Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, 89; *Bowers* v. *Kerbaugh-Empire Co.,* 271 U. S. 170, 174; *Irwin* v. *Gavit,* 268 U. S. 161, 166; *Eisner* v. *Macomber,* 252 U. S. 189, 203. The scope of § 22 (a) in some instances is limited by specific provisions, *e. g.,* § 22 (b) (9) (income from discharge of indebtedness), § 22 (b) (13) (compensation of members of armed forces), but no such provisions apply here.

obligation to return it to its owner. See, *e. g., Bank of the United States* v. *Bank of Washington,* 6 Pet. 8, 19; *Miller* v. *Eisele,* 111 N. J. L. 268, 168 A. 426; N. J. Stat. Ann. 2:73–1. A comparison of MR. JUSTICE BURTON's opinion in this case with his dissent in the *Wilcox* case reveals beyond doubt that the Court today adopts the reasoning of his prior dissent, thereby rejecting the *Wilcox* interpretation of § 22 (a). A tax interpretation which Congress has left in effect for six years is thus altered largely as a consequence of a change in the Court's personnel. I think that our former interpretation was right and do not believe that the Government is suffering because of a failure to collect income taxes from embezzlers and extortioners. Indeed further considerations strengthen my support of our *Wilcox* holding.

I fully agree that earnings from businesses such as gambling and bootlegging are subject to the income tax law even though these earnings are derived from illegal transactions. *United States* v. *Sullivan,* 274 U. S. 259. The majority seems to think that the *Wilcox* case holds otherwise because some states have laws which under special circumstances permit some particular groups to assert a legal claim for recovery of gambling losses or money paid for bootleg liquor. But these state laws vary far too much in their scope and operation to justify saying that these businessmen never have a bona fide legal or equitable claim to monies paid them. And ". . . we must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome* v. *United States,* 318 U. S. 101, 104. Moreover, even if we were to take these state recoupment laws into consideration, the sums recovered under them would do no more than decrease the yearly net earnings of such questionable businesses. To all intents and purposes bootleggers and gamblers are engaged in going busi-

nesses and make regular business profits which should be taxed in the same manner as profits made through more legitimate endeavor. However, in my judgment it stretches previous tax interpretations too far to classify the sporadic loot of an embezzler, an extortioner or a robber as taxable earnings derived from a business, trade or a profession. I just do not think Congress intended to treat the plunder of such criminals as *theirs*.

It seems illusory to believe, as the majority apparently does, that the burden on honest American taxpayers will be lightened by a governmental policy of pursuing extortioners in futile efforts to collect income taxes. I venture the guess that this one trial has cost United States taxpayers more money than the Government will collect in taxes from extortioners in the next twenty-five years. If this statute is to be interpreted on the basis of what is financially best for honest taxpayers, it probably should be construed so as to save money by eliminating federal prosecutions of state crimes under the guise of punishing tax evaders.

Since it seems pretty clear that the Government can never collect substantial amounts of money from extortioners, there must be another reason for applying the tax law to money they extract from others. The Government's brief is suggestive of the only other reason that occurs to me—to give Washington more and more power to punish purely local crimes such as embezzlement and extortion. Today's decision illustrates an expansion of federal criminal jurisdiction into fields of law enforcement heretofore wholly left to states and local communities. I doubt if this expansion is wise from the standpoint of the United States or the states.

Insofar as the United States is concerned, many think that taking over enforcement of local criminal laws lowers the prestige of the federal system of justice. It certainly tends to make the federal system top-heavy. Of supreme

importance is the fact that the United States cannot perform the monumental tasks which lie beyond state power if the time, energy and funds of federal institutions are expended in the field of state criminal law enforcement.[1]

Federal encroachment upon local criminal jurisdiction can also be very injurious to the states. Extortion, robbery, embezzlement and offenses of that nature are traditionally matters of local concern.[2] The precise elements of these offenses as well as the problems underlying them vary from state to state. Federal assumption of the job of enforcing these laws must of necessity tend to free the states from a sense of responsibility for their own local conditions.[3] Even when states attempt

---

[1] In opposing certain anti-theft legislation, Attorney General Mitchell wrote Senator Norris that, ". . . The machinery now provided by the Federal Government for the prosecution and punishment of crime is overtaxed.

"Earnest efforts are being made to devise methods for the relief of those Federal courts which are congested and to increase the capacity of our prisons to satisfy present requirements. Until we have dealt adequately with the troubles which now confront us we ought not to be adding to the burden of the law-enforcement machinery by enacting legislation of this kind." 72 Cong. Rec. 6214. Along this line, it has been said that, "It will be a long time before the few hundred agents of the Department of Justice can expand enough to do the work now given to 130,000 peace officers in the United States . . . ." Broad Program Needed for Crime Control, 20 J. Am. Jud. Soc. 196, 200.

[2] In 1950 and 1951, the Senate Crime Committee conducted investigations of organized crime. In its Third Interim Report the Committee stated, "Any program for controlling organized crime must take into account the fundamental nature of our governmental system. The enforcement of the criminal law is primarily a State and local responsibility." S. Rep. No. 307, 82d Cong., 1st Sess. 5.

[3] Commenting on this fact, Attorney General Mitchell said, "Experience has shown that when Congress enacts criminal legislation of this type the tendency is for the State authorities to cease their efforts toward punishing the offenders and to leave it to the Federal authorities and the Federal courts. That has been the experience

to play their traditional role in the field of law enforcement, the overriding federal authority forces them to surrender control over the manner and policy of construing and applying their own laws. State courts not only lose control over the interpretation of their own laws,[4] but also are deprived of the chance to use the discretion vested in them by state legislatures to impose sentences in accordance with local ideas. Moreover, state prosecutors are deprived of the all-important function of deciding what local offenders should be prosecuted. Final authority to make these important decisions becomes located in the distant city of Washington, D. C. Here, as elsewhere, too many cooks may spoil the broth.

Moreover, I doubt if this expansion of federal criminal jurisdiction can be carried on in a manner consistent with our traditional ideas of what constitutes a fair trial in criminal cases. There is the question of the wisdom and fairness of subjecting a person to double and even triple prosecutions for the same conduct, since the nation, state and municipality might make this one mistake or wrong punishable as a crime. "That consideration gives additional weight to the view that where Congress is creating offenses which duplicate or build upon state law, courts should be reluctant to expand the defined offenses beyond the clear requirements of the terms of the statute."

---

under the Dyer Act." 72 Cong. Rec. 6214. See also Boudin, The Place of the Anti-Racketeering Act in our Constitutional-Legal System, 28 Cornell L. Q. 261, 270 *et seq.*

*United States* v. *Lanza,* 260 U. S. 377, held that a defendant could be subjected to federal prosecution for violation of federal prohibition laws despite the fact that he had already been convicted under New York law for the same conduct. New York's repeal of her prohibition laws six months later highlights the loss of state responsibility for enforcing the criminal law after the Federal Government has entered the field. N. Y. Laws 1923, c. 871.

[4] See n. 5, *infra.*

144

*Jerome* v. *United States, supra,* 105. Of course, looked at technically, multiple prosecutions for the same conduct could be avoided by national prosecution of one part of the conduct, state prosecution of another part, and municipal prosecution of a third part. This would still leave a defendant faced with the burden of defending three separate prosecutions.

Expansion of federal criminal jurisdiction entails many other unfair and complicating factors. Criminal rules of substance and of procedure vary widely among the jurisdictions.[5] Punishment is frequently different. In fact, the same kind of conduct may be ignored as not worth criminal punishment by one jurisdiction while considered a serious criminal offense by another. For example, under the Federal White Slave Law men can be imprisoned five years for conduct which many states would not hold criminal at all. Schwartz, Federal Criminal Jurisdiction and Prosecutors' Discretion, 13 Law and Contemporary Problems 64, 72. When faced with specific federal legislation, such differences in treatment may be inevitable, but I do not think the tax laws should be judicially extended for the purpose of taking from local officials the responsibility for prosecuting local offenses.

---

[5] Enforcement of all or some of these rules in the federal courts injects an element of uncertainty into criminal trials. Questions arise as to how much law of what state applies. Then the federal court must attempt to decide what the state law actually is and how it applies to the particular conduct alleged to be criminal. Moreover, an opportunity to obtain an authoritative decision on a matter of state law from the highest state court is denied. Thus all the uncertain problems involved in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, are thrust upon those accused of crime in the federal courts. "And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Const. Co.,* 269 U. S. 385, 391.

When the Government takes over a case like the one before us, the resulting confusion of issues is manifestly prejudicial to the defendant. Here for instance it can hardly be said that Rutkin was tried for tax evasion. Most of the 900 printed pages of oral testimony in the two weeks' trial are devoted to proof of things other than an attempt to evade the tax. Four pages deal with Rutkin's allegedly false 1943 tax return; three pages deal with the amount of tax Rutkin would have owed if he had received $250,000 more income than he actually reported; six pages contain testimony of Rutkin tending to show willful evasion of the tax laws so as to bring the case within *Spies* v. *United States,* 317 U. S. 492. A mere reference to the contents of the remaining 887 pages shows what a great threat there was that Rutkin would be convicted because he was a "bad man" ("scoundrel" to use the trial court's title) regardless of whether he was guilty or innocent of the tax evasion charged.

Most of the evidence dealt with the following aspects of Rutkin's past life and associations: Back in prohibition days Rutkin had joined one Reinfeld and others in a bootlegging scheme called the "High seas venture." The organization made millions. About 1940, some time after prohibition ended, Reinfeld, apparently acting for the group, sold the business establishment for about $7,500,000 net. Reinfeld's accounting methods and management of the proceeds were not satisfactory to his associates. They claimed that Reinfeld held back more than his share of the millions. Reinfeld claimed that some of his former associates, including Rutkin, were "overdrawn" and entitled to nothing out of the $7,500,000. This quarrel went on for several years during which time Reinfeld was required to pay hundreds of thousands of dollars to former partners as a result of their claims that he had swindled them. Rutkin was one of them. Rutkin's $250,000 was paid to him by lawyers whose reputa-

tions seem to have been above reproach. It was paid openly. And it was some eight years later when Rutkin sued Reinfeld for more millions that Reinfeld, apparently for the first time, charged that Rutkin had extorted the $250,000 under threats of death. Yet he has been convicted here of federal tax evasion on the theory that he was guilty of the crime of "extortion." [6]

From the beginning to the end the evidence in this case was devoted to showing the lawless life Rutkin, Reinfeld and their associates led from the 1920's to 1950, ranging from bootlegging to bribery to gambling. The charge of the court largely emphasized and reemphasized the iniquity of the criminal conduct shown by the testimony. Early in his charge the trial court told the jury:

"You are not deciding which is the bigger scoundrel, Reinfeld or Rutkin; they have both blandly admitted on the stand that they prostituted justice in this country; that they paid public servants to close their eyes to law violation, and that is a canker which eats away at the body public. But you are not passing upon respective degrees of scoundrelism between any two people. The bland way in which we were told that the Reinfelds and the Rutkins and the Zwillmans and all of the others prostituted justice should give us cause for pause, but we are not passing on that question now."

In concluding his charge the trial court told the jury:

"The Government of the United States doesn't ask you to sacrifice anybody to prove its might. It asks you to do justice. That's all that Rutkin has a right to ask you to do, and that's what the government of the United States asks you to do. It asks you to

---

[6] The majority leave me in doubt as to whether the "extortion" was a state or federal crime. See n. 5, *supra.*

remember its rights too, remembering that unpunished crime, undetected crime, are threats to the majesty and dignity of our government; and that unpunished crime undermines our government. We all of us must do that which is our duty and do it without fear or favor."

My study of this record leads me to believe that the fantastic story of supposed extortion told here would probably never have been accepted by a jury if presented in a trial uncolored by the manifold other inflammatory matters which took up 887 of the 900 pages in this "tax evasion" case.

If we are going to depart from the *Wilcox* holding, I think this is a poor case in which to do so. I would reverse this judgment.