J. J. Dix, Inc. v. Commissioner. Monroe L. Dix v. Commissioner. Estate of Jacob J. Dix, Deceased v. Commissioner.
J. J. Dix, Inc. v. Commissioner
Docket Nos. 26251, 26250, 26252.
United States Tax Court
1953 Tax Ct. Memo LEXIS 248; 12 T.C.M. (CCH) 536; T.C.M. (RIA) 53174; May 20, 1953
*248 1. Held, business expenses paid by a corporation out of a fund representing unreported gross income must be deducted in determining the correct net income of the corporation. 2. Held, estimates of amounts paid over ceilings of prices and wages may not be included in cost of goods sold in the absence of evidence establishing the amounts so paid. 3. Held, an individual taxpayer may not be charged with a percentage of corporate income because of ownership of that percentage of corporate stock in the absence of evidence that he received such income. 4. Held, deficiencies determined more than three years after the filing of tax returns are barred by the statute of limitations in the absence of fraud, waivers or other statutory bases for extension of the period. 5. Held, corporate funds taken by an officer of the corporation for his own purposes by means of fraud and his dominant position are not exempt from tax as income. 6. Held, the respondent is sustained in his determination that all or part of the deficiencies determined against the president of a corporation and the corporation itself were due to the fraud of the president, individually, and as agent, with intent to evade *249 tax. Sidney Gelfand, Esq., and Bernard Weiss, Esq., 136 East 57th Street, New York 22, N. Y., for the petitioners. Clay C. Holmes, Esq., for the respondent. VAN FOSSAN Memorandum Findings of *250 Fact and Opinion The respondent determined deficiencies and additions to the tax as follows: J. J. Dix, Inc.
Declared Value
50 Per Cent
Excess Profits
Excess Profits
Fraud
Year
Income Tax
Tax
Tax
Penalties
1938
$ 1,312.77
$ 328.99
$ 820.89
1939
2,987.05
2,527.78
2,897.58
1940
2,442.75
1,848.76
2,483.90
1941
14,804.32
7,879.17
$11,905.44
18,586.88
1942
6,432.11
(650.10)
5,097.32
1943
6,007.82
6,250.14
41,633.09
26,945.53
1944
7,367.50
23,803.57
15,585.53
1945
7,056.21
(22,667.94)
Monroe L. Dix
Year
Income Tax
Penalties
1938
$ 92.21
$ 46.10
1939
1,530.19
765.10
1940
1,813.42
906.71
1941
3,680.62
2,207.32
1942
2,376.07
1,188.04
1943
3,328.90
1,669.86
1944
13,979.26
6,989.63
1945
21,790.77
10,895.39
Jacob J. Dix
1938
$ 123.67
$ 89.70
1939
1,177.73
641.96
1940
$ 5,078.71
$ 2,539.36
1941
7,859.55
4,090.06
1942
5,955.42
2,977.71
1943
2,039.79
857.95
1944
23,467.05
11,733.53
1945
14,425.13
7,212.57
The questions presented relating to petitioner, J. J. Dix, Inc., are whether it realized additional net income of $196,870.60 *251 during the years 1938 through 1944 which was not reported on its tax returns; whether it is entitled to additional deductions for selling and traveling expenses in the years 1942 through 1945; and whether the respondent erred in increasing the income of J. J. Dix, Inc. by inventory adjustments in 1941, 1942 and 1943. Questions relating to Monroe L. Dix are whether he derived taxable income of $81,242.11 as distributions from J. J. Dix, Inc. in the years 1938 through 1945 and whether the respondent erred in adding $10,100 from unidentified deposits to his 1939 income. Another question presented is whether Jacob J. Dix derived taxable income of $121,834.89 during the years 1938 through 1945 as a result of distributions from J. J. Dix, Inc. Further questions are whether the deficiencies determined by the respondent in income taxes, declared value excess profits taxes and excess profits taxes of the petitioners for the years 1938 through 1942 are barred by section 275, I.R.C., and whether the petitioners filed false and fraudulent tax returns for the years 1938 through 1945 with intent to evade taxes. Findings of Fact The facts stipulated are found accordingly. *252 The petitioner, J. J. Dix, Inc., hereinafter sometimes referred to as the corporation, incorporated in 1917 under the laws of the state of New York under the name of Port Morris Box Co., Inc., was engaged in the manufacture of paper boxes. The name of the corporation was changed to J. J. Dix, Inc. in January 1925. The original shares of capital stock, after transfer of incorporators' shares, were issued on February 14, 1917, as follows: Jacob J. Dix
4 shares
Bertha Dix (the spouse of Jacob J.
Dix)
396 shares
At the time Bertha Dix died in 1935, she still owned 396 shares of the corporation's stock. She had told her son Monroe Dix (hereinafter sometimes referred to as Monroe) that she would leave her stock to him and that he should look after his sisters and his father. After she died, no will was found and the capital stock of the corporation was allocated in 1938 one-third to Monroe Dix, one-third to his two sisters and one-third in irrevocable trust to Monroe Dix with dividends to Jacob Dix (hereinafter sometimes referred to as Jacob) while the latter was alive. This allocation was accomplished on November 19, 1938, when the 400 shares of capital stock were *253 placed in a voting trust. Voting trust certificates were issued as follows: Name
Shares
Jacob J. Dix
133 1/3
Florence Kronsky
66 2/3
Rose Selby
66 2/3
Monroe Dix
133 1/3 On November 19, 1938, simultaneously with the receipt of the voting trust certificates, Jacob J. Dix transferred to a newly created trust, of which his son, Monroe Dix, was the remainderman, the voting trust certificate for 133 1/3 shares of J. J. Dix, Inc. On October 20, 1944, by consent of all parties, the voting trust certificates, previously issued, were cancelled and new voting trust certificates were issued as follows: Jacob J. Dix
100
Florence Kronsky
50
Rose Selby
50
Monroe Dix
200 The voting trust certificates for 100 shares issued to Jacob J. Dix were then placed in a trust of which Monroe Dix was the remainderman, replacing the voting trust certificate for 133 1/3 shares previously placed in trust. Monroe Dix was vice president and a director and in charge of sales of J. J. Dix, Inc. from 1938 to 1945. Jacob Dix was president and treasurer of the petitioner corporation. The corporation's regular bank account was with the Manufacturers Trust Co. In 1938 the *254 corporation opened a bank account with the Sterling National Bank and Trust Company because the head of the bank was a personal friend of Jacob Dix. This bank account was closed in 1942. An account with the Public National Bank was opened in 1943 and closed in 1945. Deposits in these two banks aggregating $196,870.60 were made in the years 1938 through 1944 which were not reflected on the corporation's books nor included on its tax returns. The deposits in these accounts represented sales proceeds of merchandise manufactured by the corporation in the regular course of business. Included in the deposits of $196,870.60 of omitted sales was the amount of $5,200, the proceeds of a sale of a machine belonging to another corporation. All checks drawn on the Sterling National Bank and Public National Bank accounts were signed by Jacob and/or Monroe and a substantial number of checks were drawn to the order of Jacob and/or Monroe or to cash. The parties agree that a total of $5,486.87 in the following amounts were disbursed from these two bank accounts and represent allowable deductions: Blyco Paper
1940
$ 475.62
Bedford Robbins
1941
206.78
M. Schild
1941
154.50
Frieda Weiss
1942
1,000.00
Quality Art Novelty Co.
1943
3,000.00
M. Schild
1944
400.00
Monroe Paper Box Co.
1944
249.97
*255 The deposits were made in the Sterling National Bank account rather than the Manufacturers Trust Company because Jacob did not wish the latter bank to know the firm had another account. Jacob drew numerous checks on the corporation's account at the Sterling National Bank and deposited the funds in his own bank account at the Bronx County Trust Company. Monroe, who drew checks on the corporation's account in the Manufacturers Trust Company at various times, also drew checks on the Sterling National Bank account and other banks and turned the funds over to his father. Monroe had no personal knowledge of how his father spent this money. From 1939 to 1944 Monroe also drew checks in excess of $33,000 on his own bank accounts payable to Jacob which were deposited in Jacob's personal accounts. During the years 1939 through 1942, Monroe drew checks aggregating $27,750 on the corporation's account with the Sterling National Bank and deposited them in his own bank account and then within a few days drew exchange or replacement checks for a similar amount to the order of the corporation. These latter checks were deposited by the corporation in its regular bank account with the Manufacturers *256 Trust Company. In 1939 the sum of $3,000 in checks was received by the corporation. In 1940 the sum of $11,250 was received and in 1941 and 1942, $10,500 and $3,000, respectively, were received. Jacob drew checks aggregating $13,500 on the corporation's account with the Sterling National Bank in 1939, 1940 and 1941 and deposited them in his own bank account. Shortly thereafter he drew "exchange checks" amounting to $13,000 to the order of the corporation which were deposited by it in its regular bank account. In 1939, $2,500 was received by the corporation in exchange checks from Jacob. In 1940, $8,000 was received, and $2,500 was obtained in 1941. The amounts received by the corporation from Jacob and Monroe by exchange or replacement checks were not credited to special accounts but were recorded as cash sales. The corporate records and bank accounts balanced during the period of these deposits. The amounts withdrawn by Jacob and Monroe were not reflected on their federal income tax returns nor were they reflected in the net worth of either. Monroe did not keep for himself any amounts withdrawn on the Sterling National and Public National Banks. The exchange checks drawn by Monroe *257 were never paid back to him by the corporation. In addition to the aforementioned exchange checks, Monroe drew the following checks to J. J. Dix, Inc.: Date
Amount
10/24/39
$ 5,000.00
6/29/40
3,000.00
4/14/42
3,000.00
12/18/45
26,244.05
12/18/45
3,135.45
In December 1945 exchange checks from Monroe for $26,244.05 and $3,135.45 were deposited by the corporation in its regular bank account and credited to sales income on corporate books and reported as such in its tax returns. Also in December 1945, the corporation received $34,000 United States Treasury bonds purchased with funds from the Public National Bank account for which amount sales were credited on the corporate books and reported as such on its tax returns. In 1943, 1944 and 1945, the supply of paper board necessary to manufacture boxes was very limited and many mills were not operating at capacity because of the shortage of wastepaper. The supply of wastepaper was controlled by wastepaper dealers and it was common practice in the industry during these years to have wastepaper dealers deliver wastepaper board to paper board mills which would then allocate a supply of paper board to various box *258 manufacturers. Cash was paid to the dealers to induce them to deliver the wastepaper to the mills. Dealers delivered wastepaper to mills for the credit of J. J. Dix, Inc.
The Continental Paper Company, a manufacturer of paper board, received between 600 and 700 tons of wastepaper in 1943, 447 tons in 1944 and a small amount in 1945 from scrap dealers for the credit of J. J. Dix, Inc.The Continental Paper Company sold 613 tons of paper board to the corporation in 1943, 860 tons in 1944 and 367 tons in 1945. This paper board was allocated to the corporation by wastepaper dealers who sent the scrap paper to the Continental Paper Company. The latter company supplied 25 per cent to 35 per cent of the paper board requirements of J. J. Dix, Inc.The Continental Paper Company, although approached by numerous persons who offered to sell wastepaper at prices above the ceiling of $15 a ton, refused to buy under these conditions and paid only the ceiling price. It was common knowledge in the trade that many customers of the Continental Paper Company were paying sums of money over the ceiling price to the wastepaper dealers for paper stock. The shippers of such wastepaper were not usually regular *259 customers of the Continental Paper Company. The Continental Paper Company felt obligated to deliver the paper board to the company designated by the shipper after making a reservation in the paper stock to cover shrinkage and the amount put aside for the federal government. The practice of the wastepaper shipper designating a manufacturer of paper board was not a common trade practice but existed only during the years 1943, 1944 and 1945 when supplies were inadequate. A union official recommended to Jacob a source from which he could obtain wastepaper. An over ceiling price was required to be paid and the amount varied from $5 to $15 per ton. Monroe never saw his father pay paper dealers in excess of ceiling prices. The percentage of gross profit reported by the corporation during the years in question, after inventory adjustments by respondent, were as follows: 1938
35.89%
1939
40.22
1940
31.11
1941
37.04
1942
35.99
1943
36.67
1944
33.13
1945
41.98
The corporation was a member of the National Paper Box Manufacturers Association from 1942 through 1945. The percentage of gross profit during these years, of members of the association in the United States, *260 varied from 22.82% to 24.41%. Members of the association in the eastern division received gross profit percentages averaging from 21.76% to 28.13% during the same years. In 1943, 1944 and 1945, the corporation employed between 80 and 130 persons. Of these, four or five were office workers under the supervision of Monroe. The balance were factory workers. In these years, Monroe paid additional salaries amounting to $5,317.41 from his personal checking account to certain employees of the corporation. In 1943 he paid $1,799.76. In 1944 a total of $3,317.65 was paid by Monroe and in 1945 a $200 payment was made. He was reimbursed for these payments by checks drawn on the Public National Bank account of the corporation. These amounts paid by Monroe to employees were not approved by the Wage Stabilization Board. Monroe did not make any withdrawals from the Manufacturers Trust Company account to pay additional salaries. Monroe never saw his father make the cash payments which he claimed to have made to employees, approximating $800 per month over the three year period. The books of the corporation did not reflect any additional payments for labor during the years 1938 to 1945, inclusive. *261 The corporation paid a commission of $5,000 annually to at least one person for obtaining business during the years 1938 through 1942. These payments were not reflected on its books and were derived from funds on deposit in the two unrecorded bank accounts. No allowance was made by the respondent for expenditures other than those found on the corporation books. A tax consultant was unable to find on the books any specific amounts paid out for salaries or wastepaper. In failing to report certain sales, the corporation went through the regular process of issuing a charge for them but the proceeds when received were not included on the books of account. The usual sales voucher was given at the time the sales were made. Jacob told various persons that he opened the accounts with the Sterling National Bank and the Public National Bank because he was going to use the money deposited therein for purposes which he could not reveal. Jacob also declared that he was paying extra amounts to paper dealers but the records of the corporation do not reflect any such payments. No items drawn from the corporation's two bank accounts other than the Manufacturers Trust Company account were identified *262 upon the corporation's books. Jacob never informed Monroe of the fact that all sales were not being included on the corporate books. The merchandise inventories of J. J. Dix, Inc. at December 31 were as follows: 1940
$29,045.86
1941
44,896.70
1942
23,416.50
1943
10,419.60
1944
20,867.00
1945
23,584.65
The corporation did not declare any dividends from 1938 through 1945. About April 1945, Monroe first discovered that deposits and withdrawals from the Sterling National Bank and the Public National Bank were not on the corporation's books. At that time Jacob was spending considerable sums of money and Monroe asked his father for an accounting, which was refused. Considerable disagreement arose between the father and son and the firm's accountant concerning the failure to record gross sales and costs. Jacob refused to disclose what he did with the omitted funds. After his wife's death, Jacob Dix became the dominant person in the management of the firm and Monroe was subordinated to his father. Monroe learned from his mother prior to her death that his father had a weakness for gambling. Jacob went to Florida on vacations lasting several months in the wintertime *263 and received the money for these trips from Monroe. Because of his domination of the corporation, no attempt was made by Monroe to curtail Jacob's expenditures. Personal checks of Jacob were drawn to hotels and gamblers in Florida. In 1944, $10,000 worth of traveler's checks were purchased by Jacob and a similar amount was purchased in 1945. Monroe purchased $10,000 worth of American Railway Express traveler's checks in 1944. These purchases were made for Jacob's convenience in obtaining cash with funds derived from the unreported bank accounts. Monroe did not know how his father spent the money so obtained. After Jacob's death, $25,500 in cash was found in a vault in the name of his stepdaughter. Monroe, a co-executor of his fathers' estate, was unaware of the existence of this money prior to his father's death. The federal income tax returns of Jacob and Monroe for the years 1938 through 1945 do not disclose any of the funds withdrawn from the Sterling National Bank and the Public National Bank in these years. It is agreed by the parties that any money drawn by Monroe and Jacob from these two accounts and not returned to or spent on behalf of the corporation were withheld from *264 and are due to J. J. Dix, Inc.
Total deposits in Monroe's bank accounts in 1939 amounted to $30,552.92. The following deposits are identifiable: Salary reported on return
$ 7,800.00
Proceeds of sale of securities reported
on return
4,928.85
Jan. 27. J. J. Dix Inc. Exchange
1,500.00
Jan. 27. J. J. Dix Inc. Exchange
1,500.00
Mar. 20. H. Grieson Exchange
500.00
Apr. 8. New Rochelle Trust Ex-
change
350.00
Apr. 13. H. Grieson Exchange
2,000.00
May 11. H. Grieson Exchange
2,000.00
Sept. 15. Loan - National City Bank
1,054.00
Dec. 9. J. J. Dix, for car
1,200.00
Dec. 21. J. J. Dix, Inc.
500.00
$23,332.85
In the years 1942 through 1945, Monroe Dix, as sales manager of the corporation, purchased gifts for suppliers and customers. Jacob also incurred entertainment expenses on behalf of the corporation during these years. Monroe traveled for the corporation during 1944 and 1945 to see contractors located near the east coast. The corporation reimbursed Monroe and Jacob for traveling and entertainment expenses of the corporation incurred during these years. Corporate expenses for traveling, entertainment, gifts and similar purposes were $5,000 in 1942, *265 $8,000 in 1943 and $11,000 in each 1944 and 1945. The income tax returns of Monroe and Jacob and the income, declared value excess profits tax and excess profits tax returns of the corporation for the calendar years 1938 through 1942 were filed on or before March 15, 1943. The respondent determined the deficiencies against the petitioners on November 9, 1949. The petitioners, Monroe Dix and the Estate of Jacob J. Dix, by amended petitioners, pleaded that the deficiencies determined as to the years 1938 through 1941 were barred by the statute of limitations. The Current Tax Payment Act of 1943 is pleaded as a discharge of the 1942 tax liability. Petitioner, J. J. Dix, Inc., pleaded the statute of limitations as a bar to the deficiencies determined for the years 1938 through 1942. Each of the taxpayers filed consents fixing the period of limitation upon assessment of income and profits tax and extending the period of assessment in each of the years 1943, 1944 and 1945 until June 30, 1950. In June 1945, Monroe and Jacob together with their accountant sought tax advice regarding the returns for the years 1943, 1944 and 1945 because of the unreported receipts and disbursements. In *266 August 1945, a letter was addressed to the respondent stating that there had been an understatement of gross income. The letter informed the respondent that the taxpayer was making a voluntary disclosure and requested a detailed investigation. The letter also declared that it appeared that additional income taxes were due the federal government. No examinations of the petitioners' returns were pending at the time this letter was sent to the respondent. The respondent, in determining the deficiencies did not allow any deductions for payments to wastepaper dealers, or for salaries or commissions that are not reflected on the books of account. The respondent increased annual sales of the corporation in the following amounts: 1938
$ 6,222.40
1939
13,614.90
1940
32,872.36
1941
37,789.82
1942
9,593.65
1943
30,588.30
1944
66,189.17 The respondent allocated one-third of the money drawn out of the Sterling National Bank and the Public National Bank accounts for the years 1938 through October 20, 1944 to Monroe, and two-thirds to Jacob. After that date, equal allocations were made. The petitioners' representatives cooperated with the respondent's investigators. *267 Respondent determined fraud penalties as to Jacob, Monroe and the corporation. No parts of the deficiencies determined by the respondent against Monroe Dix for the years in question was due to fraud with intent to evade tax. Part of the deficiencies determined in each of the years in question against the estate of Jacob J. Dix was due to fraud with intent to evade tax. Part of the deficiencies determined in the years 1938 through 1944 against J. J. Dix, Inc. was due to fraud with intent to evade tax. Opinion VAN FOSSAN, Judge: At the outset it should be noted that the respondent concedes that the period prescribed by the normal statute of limitations [1] has expired upon those determinations against which the petitioners have pleaded the statute of limitations. The respondent contends, however, that, excepting the corporation for 1945, all the petitioners were guilty of fraud during the years before us. To sustain the deficiencies otherwise barred by the statute of limitations, the respondent must prove fraud by clear and convincing evidence. *268 The initial question to be determined is whether the petitioner corporation realized additional net income in excess of the amounts reported by it during the years in question. It is agreed that receipts from sales in the amount of $196,870.60 were deposited in the Sterling National Bank and the Public National Bank during the years 1938 through 1944. These amounts were not recorded on the corporate books nor included in gross receipts for tax purposes. The petitioners contend, however, that some of the money so deposited was later withdrawn and deposited in the corporation's regular bank account and recorded as sales receipts on its books and tax returns. During 1945 "exchange checks" drawn by Monroe Dix in the amounts of $26,244.05 and $3,135.45 were deposited by the corporation in its regular bank account and credited to sales. The funds originated in the Sterling National and Public National bank accounts, as did the funds used to purchase $34,000 worth of United States Treasury Bonds similarly credited to sales on the corporate books. This total of $63,379.50 was included in 1945 income of the corporation and reported as such. The respondent determined no unreported corporate *269 sales for 1945. We do not know whether such sales proceeds were deposited in the unrecorded bank accounts in 1945, or in previous years. But since the respondent has not included unreported sales for 1945 in the determination of the deficiencies before us, the deficiencies for the prior years would be unaffected regardless of whether the amount of $63,379.50 represented sales proceeds for 1945, or for prior years. During the years 1939 through 1942, Jacob and Monroe Dix drew "exchange checks" aggregating $13,000 and $27,750, respectively, which were deposited by the corporation in its regular account. Although no direct evidence exists that these amounts were properly included in sales income during the years of receipt, we reach the above conclusion because the sums were not credited to special accounts but to cash sales during this period. Corporate bank accounts and accounting records balanced. Monroe did not receive back any of the money so deposited nor was any portion of it reflected in the net worth of Jacob and Monroe. The total of these checks, $40,750, must be considered to have been reported as sales income in the years when received in the regular corporate bank account. *270 No contention is made that the corporation did not report the sales reflected on its accounting records. A reduction, in the amount of $40,750, must be made to the unreported sales determined by the respondent for the respective years in which the exchange checks were received. The parties agree that amounts aggregating $5,486.87 were paid from the Sterling National and Public National Bank accounts and represented allowable deductions from gross income during the years specified in the findings of fact. These amounts similarly reduce unreported corporate sales for the years in which they were paid for purposes of determining unreported corporate net income. Also included in the total of unreported sales was $5,200, the proceeds from the sale of a machine belonging to another corporation. This amount can be excluded from the unreported sales of the petitioner corporation in the year that the proceeds of this sale were deposited in the petitioner corporation's bank account. The parties agree that the proceeds were derived from the sale of a machine that did not belong to the corporation but the evidence does not disclose in which year the receipts were erroneously deposited in the *271 petitioner's bank account. If the parties can agree upon the year of deposit on the Rule 50 computation, this amount will be excluded from unreported sales of that year. The petitioners contend that amounts were expended by the corporation from the two unreported bank accounts for business purposes which should be subtracted as cost of goods sold or deducted as expenses [2] from the balance of unreported sales in the determination of net income during the several years before us. It is urged that amounts were expended by Jacob Dix in making overceiling payments to wastepaper dealers in order to have such persons consign paper to paper board manufacturers for the benefit of J. J. Dix, Inc. It is estimated by the petitioner that $25,000 was used for this purpose. However, there is no evidence as to the actual payment of any money for this purpose. Monroe never saw his father make payments of this type. Although he gave his father considerable sums of money over the period when paper was in short supply, he did not know how his father spent these funds. The prevalent practice of making overceiling payments to wastepaper dealers was well known and it may be that Jacob Dix made such payments *272 from funds originating in the unrecorded bank accounts. It is impossible to determine, however, except by mere guesswork, how much was spent for this purpose. Assumptions based upon the business transacted by J. J. Dix, Inc. and the Continental Paper Company do not provide a basis for estimating overceiling payments to wastepaper dealers. It is not known how much above the ceiling price was paid by Jacob nor what portion of the paper shipped to the corporation resulted from overceiling payments. Moreover, it is not known in what years such payments were made, even if the total could be estimated. The petitioners' estimate of $25,000 is not broken down into yearly figures which would be required to offset unreported sales of specific annual amounts and to redetermine the tax on annual income. This contention must be denied for failure of proof. *273 The petitioners contend that a portion of the sum of $5,317.41 paid by Monroe Dix in 1943, 1944 and 1945 is deductible as wages to factory workers engaged in the production of the corporation's products. Monroe was reimbursed from the Public National Bank account for these salaries. Salaries paid to production workers qualify as segments of cost of goods sold. However, the amount paid by Monroe to workers engaged in production, rather than those engaged in office work, is not known and no basis exists for making a reasonable estimation. Monroe was in charge of some office workers and no evidence of record demonstrates what portion of the amounts spent was paid to workers engaged in production. For this reason, deduction of some portion of the amounts paid by Monroe cannot be allowed. The petitioners urge that Jacob Dix paid $28,800 in overceiling salaries during 1943, 1944 and 1945 to employees at an approximate rate of $800 per month and seek to deduct such amount from unreported sales. There is no direct evidence of such payments. The only evidence presented is testimony as to what Jacob said he paid and a note of Jacob's stating that he made such payments. In view of the record *274 as to Jacob's conduct in the corporation's business affairs, we can give little credence to such secondhand evidence. Monroe had no knowledge concerning such payments other than what his father told him. No other evidence of record supports the contention made. The petitioners must bear the burden of proving that such amounts were paid by Jacob to persons engaged in production and that the money paid was derived directly or indirectly from the bank accounts in which the unreported sales were deposited. This burden has not been sustained. The petitioners have not proven that Jacob made annual payments in any amount to factory workers. The deduction of amounts allegedly paid by Jacob over the years to factory workers must be denied for lack of proof. The petitioners seek deduction for commissions paid. The evidence discloses that commissions were paid by Jacob to at least one person for obtaining business during the years 1938 to 1942. The payments were made in cash derived from the unreported bank accounts. The evidence does not establish how much was paid yearly but it provides a basis for the estimation under the rule of Cohan v. Commissioner. 39 Fed. (2d) 540, that *275 $5,000 was paid in each year from 1938 to 1942. Deductions of $5,000 annually under the provisions of section 23 (a) of the Internal Revenue Code as business expenses will be made in each of these years from the unreported sales of each year in order properly to reflect annual net income of the corporation. We conclude, in summary, that the unreported sales over the period 1938 through 1944 aggregating $196,870.60 must be reduced in the amount of $40,750 which was reported as income in the years received, as set forth in the findings of fact. A further reduction must be made in determining annual corporate net income over these years in the amount of $5,486.87 representing proper deductions in the years specified in the findings of fact. A deduction of $5,000 must also be taken in each of the years from 1938 to 1942 for commissions paid and $5,200, the proceeds of the sale of a machine, is to be eliminated from unreported sales income in the year of its receipt. The petitioners seek to support further reductions of corporate income resulting from unreported sales during these years by the fact that the petitioner corporation's percentage of gross profits was *276 higher than the industry average. It is sufficient to note that while the corporation may have expended considerable sums paying overceiling prices and wages, the evidence does not substantiate the disbursements of such amounts in the years before us. The final contention made with respect to the unreported sales is that those amounts not returned to the corporation or expended on its behalf were misappropriated by Jacob Dix and deduction therefor is sought under section 23 (f), I.R.C.[3] as a loss sustained as a result of the misappropriation of funds. The evidence gives good reason to believe that Jacob improperly took corporate funds and spent the money for his own benefit. The evidence, however, does not disclose how much Jacob improperly appropriated from funds deposited in the corporate accounts with the Sterling National and Public National Banks. The amounts returned to the corporation's regular bank account, the amounts expended for overceiling payments to wastepaper dealers, commissions and the amounts spent for other corporate purposes were not misappropriated. The amounts expended for overceiling payments to wastepaper dealers have not been established *277 and we do not know how much Jacob misappropriated. Nor do we know the years in which Jacob misappropriated corporate funds, nor the amounts taken by him annually for his own purposes. Even if deduction of the entire amount might be allowed in 1945, the year of discovery of the theft, in accordance with Gwinn Bros. & Co., 7 T.C. 320, the total amount misappropriated is unknown. No basis exists in the evidence to make an estimation of the amount of money improperly taken by Jacob. For this reason, the deductions for any losses sustained as a result of misappropriated funds must be denied to the corporation. The second issue relates to traveling, selling and entertainment expenses of the petitioner corporation for the years 1942 and 1945. The corporation expended various sums in reimbursement of Jacob and Monroe for traveling and entertainment expenses on behalf of the corporation during *278 1942, 1943, 1944 and 1945. In the latter two years, Monroe was required to travel to contact suppliers of the corporation during the period of the paper shortage. The corporation also incurred expenses in the years 1942 through 1945 for gifts, presents and other items purchased for good will purposes. The respondent admits that increased expenses over the amounts determined have been established by the petitioners. We have found that amounts expended by the petitioner corporation in traveling and entertainment expenses aggregated $5,000 in 1942, $8,000 in 1943, and $11,000 in each 1944 and 1945. These amounts are properly deductible by the corporation in these years. The final issue relating to the petitioner corporation, excepting the fraud issue, is whether the respondent erred in making inventory adjustments in 1941, 1942 and 1943 to equalize the corporation's gross profit during the years 1941 through 1945. On brief respondent, in effect, admits the corporation's contentions as to the inventories. The record supports the corporation on this item and consequently all of respondent's adjustments growing out of inventory adjustments for the years 1941 through 1945 are eliminated. *279 The principal issue presented with respect to the deficiencies determined against Monroe Dix is whether that petitioner realized unreported net income in the amount of $81,242.11 during the years in question. This amount is determined by the respondent as one-third of the unreported sales of the petitioner corporation up to October 20, 1944 and one-half thereafter because Monroe Dix owned one-third and one-half, respectively, of the corporation's stock during these periods. It is noted that sizable portions of the total unreported sales have been eliminated from corporate net income because specific amounts originating in the unreported bank accounts were spent for corporate purposes. Moreover, the respondent's determination that Monroe received one-third and one-half of the unreported sales during the period before us is erroneous because the evidence does not disclose that Monroe received any amount from the unreported sales proceeds as income. The evidence reveals that Monroe drew checks on the unreported bank accounts and either turned the money over to his father, spent it on behalf of the corporation or deposited it by exchange check in the regular corporate bank account. Monroe *280 did not keep for himself any amount withdrawn from the Sterling National and Public National Bank accounts. No income derived from this source is reflected in his net worth. Although he may have been lax, as a corporate officer, in failing to discover his father's defalcations until April 1945, the evidence does not support the contention advanced by respondent. For this reason, he cannot be deemed to have failed to report any portion of the $81,242.11 determined by the respondent. A second issue relating to the deficiencies determined against Monroe Dix is whether the respondent erred in adding $10,100 in unidentified bank deposits to 1939 net income. The parties agree that deposits to Monroe's bank account in 1939 aggregated $30,552.92, of which $23,332.85 is identifiable. Included within the identified portion are salary payments and the proceeds of a sale of securities which were reported on his return. The balance of the deposits, except possibly for one item, were not items of income. The unidentified balance of $7,220.07 and the $500 paid by J. J. Dix, Inc. in December 1939 may have represented deposits of income items. However, the respondent agrees that the statute of limitations *281 bars any deficiency for this year unless fraud is provided. [4] The evidence does not establish fraud by Monroe as to the 1939 income. [5] Lacking fraud, the deficiency determined against him for 1939 is barred. The remaining deficiencies determined against Monroe have been held to be in error and consequently there can be no fraud penalties. The respondent determined that Jacob Dix failed to report $121,834.89 as income during the years 1938 through 1945. This sum, it is said, represents the balance of unreported *282 corporate sales not included in the income of Monroe Dix. Of the total unreported sales of $196,870.60, we have found that $40,750 was returned to the corporation by exchange checks and properly included in income. The sum of $5,200 belonged to another corporation and $5,486.87 was expended from the fund of unreported sales for deductible purposes. Of the total amount, $63,379.50 was returned to the corporation in 1945 and reported as income in that year. Monroe was reimbursed from the Public National Bank account in the amount of $5,317.41 for overceiling salaries paid. A total of $20,000 was paid from the unreported bank accounts for commissions during the years 1938 to 1942. These amounts, totaling $140,133.78, could not have been received as income by Jacob Dix. The balance of $56,736.82 is all that Jacob could have received as income. The corporation also spent some portion of the unreported sales fund in overceiling payments to wastepaper dealers, but this amount cannot be ascertained from the evidence before us. The amounts spent annually by Jacob for his own purposes is unknown and deductions have been denied to the corporate petitioner because of this failure of proof. Although *283 Jacob's net worth did not reflect any such misappropriations, he spent large amounts on vacations and gambling which might not be reflected in a determination of his net worth. The sum of $25,500, which could not be identified as to source, was discovered at his death. The respondent has determined that all of the unreported sales, except the amounts attributable as income to Monroe, should have been reported by Jacob as income in the years the sales proceeds were received. We have determined, by eliminating specific sums from the unreported corporate sales of the individual years, that the total amount that could have been received as income by Jacob during the years 1938 through 1945 is $56,736.82. The estate of Jacob J. Dix, as the petitioner, must bear the burden of proof in combating the deficiency. It has not established that the respondent erred in his determination that Jacob appropriated this amount for his own purposes during the years in question. As a result, we conclude that the respondent must be sustained to the extent of $56,736.82 being included as income of Jacob Dix during these years. The parties agree that any amounts taken by Jacob which were not returned to *284 or expended on behalf of the corporation, belong to and are due to that corporation. Jacob acquired these funds by withdrawing money from corporate accounts for his own purposes and by misappropriating funds given to him for business purposes by Monroe. Until 1945, Monroe was unaware of the true situation and he did not realize that all corporate sales were not being reported. Monroe, dominated by his father and deceived as to Jacob's purposes in obtaining corporate funds, was unable to prevent the misuse of corporate bank accounts. Jacob, utilizing his dominant position to his own personal advantage, deceived his son and the corporation's accountant while improperly acquiring corporate funds for his own benefit. We do not believe Commissioner v. Wilcox, 327 U.S. 404, cited by the petitioners, controls the factual situation presented here so as to preclude placing the misappropriated fund in Jacob's income. Rutkin v. United States, 343 U.S. 130, limits the Wilcox decision to its facts. The facts here are distinguishable and we have held that the sum of $56,736.82 must be considered as income of Jacob Dix during the years in question on the basis of the Rutkin *285 decision and this Court's decisions in Henry C. Boucher, 18 T.C. 710, and W. L. Kann, 18 T.C. 1032. Jacob Dix knew that he had received large amounts of funds from the corporation and from Monroe which he failed to report as income, although he used the money for his own purposes. No excuse or explanation is presented. As above noted, the evidence discloses that Jacob acquired the funds by fraud practiced upon Monroe and by his domination of his son. There can be no doubt Jacob wished to continue his peculations and for this reason omitted the corporate sums acquired for his own purposes from his tax returns. The respondent has sustained the burden of proving that Jacob fraudulently omitted from income the amounts appropriated by him for his own purposes during all the years before us. Since Jacob was guilty of fraud as to all the years, the deficiencies determined against him are not barred by the statute of limitations. The petitioner corporation's failure to report all of its gross income and to pay taxes upon its proper net income was due to the fraud of its president, Jacob Dix. Jacob, as president of the corporation, without the knowledge or assistance *286 of Monroe, had kept deposits of sales proceeds from being included on the corporate records or reported for tax purposes. Monroe was of the mistaken opinion that all corporate sales were reflected on the tax returns and did not discover his error until 1945. He then brought the matter to the attention of the respondent's agents. As noted above, the failure of the corporation to file proper returns is not due to any fraud on the part of Monroe. But Jacob, as president of the corporation, was clearly guilty of fraud in filing corporate returns. The wilful failure to report corporate income derived from sales proceeds known to have been received and deposited in corporate bank accounts leaves no conclusion to be drawn other than fraud. No reason has been suggested for the failure to report sales receipts deposited in these accounts other than that the corporation's principal officer wished to appropriate corporate funds for his own purposes without paying taxes. We hold that the corporation, acting through Jacob Dix as its agent, must be held responsible for the fraud of its president in filing false corporate returns. Summerill Tubing Co., 36 B.T.A. 347; Saven Corporation, 45 B.T.A. 343. *287 The additions to the tax due to fraud by the corporation are sustained as to the years 1938 through 1944. None of the deficiencies determined against the corporation for any of the years are barred by the statute of limitations. Decisions will be entered under Rule 50. Footnotes
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodgings) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(f) Losses by Corporations. - In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise. * * *↩
4. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. * * *↩
5. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩