Mathias Schira and Susie Schira v. Commissioner. Mathias Schira v. Commissioner.
Schira v. Commissioner
Docket Nos. 50339, 50340.
United States Tax Court
T.C. Memo 1956-35; 1956 Tax Ct. Memo LEXIS 262; 15 T.C.M. (CCH) 155; T.C.M. (RIA) 56035; February 15, 1956
Alvin H. Rowe, Esq., Carew Tower, Cincinnati, Ohio, for the petitioners. Robert E. Johnson, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined income tax deficiencies and additions to the tax as follows: Mathias Schira and Susie Schira
Additions
Docket
to tax under
No.
Year
Deficiencies
sec. 293(b)
50340
1944
$ 2,064.17
$ 1,032.08
50340
1945
11,662.74
5,831.37
50340
1946
10,334.05
5,167.03
50340
1947
8,360.27
4,180.13
50339 *
1948
6,291.08
3,145.54
50340
1949
72,095.82
36,047.91
The issues for decision are whether the amounts which Mathias Schira received but did not report *263 during the taxable years were taxable income from the sale of merchandise, whether Mathias' returns, if any, for the years 1944 through 1947 were false or fraudulent with intent to evade tax under the provisions of section 276(a) of the Internal Revenue Code of 1939, and whether any part of each deficiency was due to fraud with intent to evade tax under the provisions of section 293(b) of the Internal Revenue Code of 1939. Findings of Fact Mathias Schira filed his individual income tax returns for the years 1944, 1945, 1946 and 1949, and he and Susie, his wife, filed a joint return for 1948, with the collector of internal revenue for the first district of Ohio. An unsigned Form 1040 for 1947 with Mathias' name typed thereon was received by the collector on March 5, 1948. Adjusted gross income and net income were shown on those documents as follows: Adjusted
Year
Gross Income
Net Income
1944
$2,850.36
1945
2,795.06
1946
2,860.40
$2,527.35
1947
2,701.39
2,420.27
1948
4,481.64
1949
4,666.71
3,907.07
Mathias was born in Austria-Hungary and came to the United States in 1907 where he was naturalized in 1941. He was employed from 1908 until the *264 spring of 1950 as shipping clerk by the Cincinnati Galvanizing Company. He was aided by several men in loading the trucks which delivered the company's products. That company manufactured buckets, tubs, cans and other galvanized merchandise which were stored in the company's warehouse and loaded by Mathias on shipping orders. Ruth Bennett, after working as a clerk for a paper company and in the adjustment office of Sears Roebuck, was employed in 1935 by a hardware company in Cincinnati. She kept books and clerked in that store until January 1944. She opened her own hardware store in 1944 under the name of "R. L. Hardware & Supply Co." She obtained some enamel ware, then in short supply, from Alex Bell. Ruth and Mathias joined in a scheme during all of the taxable years pursuant to which Mathias diverted galvanized merchandise from his company's warehouse and Ruth received and sold the goods. Ruth and Mathias shared equally in the proceeds from such sales. Substantial amounts were received by each in each taxable year involved herein. The method of operation was that several times a week Mathias would load galvanized ware, or have it loaded, into the 1 1/2 ton truck of Louis Miller, *265 a contract trucker for the Cincinnati Galvanizing Company. Miller would haul that merchandise to a building in another part of the city where Ruth was usually waiting, and where the merchandise on the truck was delivered to Alex Bell, generally by direct transfer onto Bell's truck. No shipping tickets or other memoranda accompanied those deliveries. Ruth at first paid Miller $5, later $10 and finally $15 for each load hauled. Ruth gave Miller, at the time of each delivery, a tied package containing cash in payment for the previous delivery, to give to Mathias. Miller delivered the packages to Mathias without opening them. Mathias never opened those packages in Miller's presence. Bell had never met and had no direct dealings with Mathias during the time he purchased galvanized ware from Ruth. Bell paid Ruth by cash in the earlier years and by check beginning in June 1947. The checks in 1947 amounted to more than $29,000. Those checks were in payment for the merchandise in question and were drawn on the account of Bell or his company, the Norwood Express & Drayage Co., payable to the R. L. Hardware & Supply Co.
Neither Ruth nor her R. L. Hardware & Supply Co. kept any records of *266 the checks or amounts received from Bell or the amount of currency sent to Mathias. George Schott, secretary of the Cincinnati Galvanizing Company, attended an inindustry meeting in Chicago in 1949 where he was informed of the sale of merchandise bearing the markings of his company at prices which he thought were not possible. The sale was verified and the Cal Crim Detective Bureau was called in to make an investigation. The investigation disclosed that the purchases were being made from Bell, who was obtaining the merchandise from Ruth and Mathias. The total amount of merchandise thus taken could not be established from the company's antiquated system of inventory and record keeping. Mathias, freely and without duress, on October 8, 1949, told of taking the galvanized ware. The following instrument typed at that time by one of the private detectives on the case, and signed by Mathias is a fair statement of what Mathias then said: "October 8th, 1949. "I, Matthias [Mathias] Schira, 59 years of age, residing at 2145 Weron Lane, make the following statement of my own free will and accord, without any threats or promises, having been told it may be used against me in court. *267 "I have been employed as a shipping clerk for The Cincinnati galavanizing [Galvanizing] Co. for about the past 39 years. "About 2 1/2 years ago, I was approached by the Present Mrs. Ruth Bennett, wife of Chester Bennett, as to their obtaining galvanized wear from me thru illegal deliveries. "I would be in communication with one of the Bennetts, and advise them when to expect a delivery, which would be sent to Commerce and Elm Streets for transfer to a truck owned by Alex Bell of The Norwood Express & Drayage Company. This truck would be driven by Louis Miller, contract trucker for The Cincinnati Galvanizing Company. They would then give him money which he turned over to me, for about an average of $300.00 per week. "During this period of time I received from deliveries of wares in the above manner, approximately $35,000.00 (Thirty Five Thousand Dollars) which I converted to my own use. "I have read the foregoing statement and it is true and correct. M. Schira" The Cincinnati Galvanizing Company, on October 12, 1949, executed and placed in escrow a general release to Mathias, and on October 14, 1949, after payment of $35,000 by Mathias, he was given the release and a *268 receipt. Mathias, who continued in the employ of the company, came to William Schott, its Vice President, on October 17, 1949, and said he wanted to make a clean breast of it and tell the entire truth. One of the detectives was then called in and Mathias, freely and without duress, told Schott and the detective of the conspiracy and its operation. His statement was typed at that time by the private detective. The statement as typed was read to Mathias, he signed it and the detective and William Schott witnessed it. It was as follows: "October 17th, 1949. "I, Matthias [Mathias] Schira, make the following supplementary statement of my own free will and accord, without any threats or promises. This statement is a true explanation of the origination and operation of the thefts admitted by me in a previous statement, taken on October 8th 1949. "I originally was contacted by Mrs. Ruth Bennett (at that time, Ruth Bohl) in a car near the trade school at Hopple Street, about 1935. Present in the car was her mother and a large dog. Mrs. Bennett suggested that I send out loads of galvanized wear thru Louis Miller, contract trucker for the Cincinnati Galvanizing Co. She suggested a 50-50 proposition, *269 whereby we both would receive half of the proceeds, saying that it would be simple without any danger of being caught. The second time she spoke to me about it, about two months later, was outside of the plant. Finally, I agreed to her proposition, whereby we would share equally; that she would cash all checks and send me cash; that Alex Bell would buy all she could get and that it would be sent all over the country and could not be run down later or traced. "To the best of my memory and recollection, the following amounts of money were paid which was shared equally between Mrs. Bennett and myself. If anything, I would say that in many instances, she received a larger amount than I did. First 6 months of 1949 - $1300.00 per wk. of which I received half. 1948 - $1300.00 per wk. of which I received half. 1947 - $1200.00 per wk. of which I received half. 1946 - $1200.00 per wk. of which I received half. 1945 - $1200.00 per wk. of which I received half. 1935 to 1944 - $500.00 per wk. of which I received half. "The reason for the increase after 1944 was that Mrs. Bennett urged greater shipments in larger amounts. The price was established by Mrs. Bennett at distributor's *270 prices, and she would designate merchandise that Mr. Bell could handle. "About three months ago, she told me to stop on all shipments, as Mr. Bell was being investigated about some woman. On Friday night, October 7th, Mrs. Bennett and her husband Chester Bennett were waiting for me outside of my home. They told me to meet them in Norwood near the police station, where I later met them. In their car, for the first time, I met Alex Bell. Mr. Bell said very little, other than 'It's a bad thing. They got us'. They all warned me not to talk or to say anything. Mrs. Bell at one time suggested 'The best thing is to all chip and pay off', but Chester Bennett replied 'No'. The last thing I was told before I left them, was 'Don't say anything. You don't know anything'. Since then I have seen the Bennetts once and they wanted to know what I found out, and suggested that I get a lawyer. Also, that I still say I don't know anything. Chester Bennett made the remark that he was willing to go to jail instead of his wife. "I have read the foregoing statement and it is true and correct. "/s/ Mathias Schira "WITNESSES: "/s/ Norman Sloan /s/ Wm. C. Schott" Mathias received interest and dividends *271 on savings and building and loan accounts during the years 1944 through 1948 as follows: 1944
$ 96.95
1945
91.72
1946
101.17
1947
108.86
1948
107.89
Mathias' W-2 and 1040 forms for the years 1944 to 1949, inclusive, were filled out by Ralph Newhouse, an accountant employed by the Cincinnati Galvanizing Company, who usually made out returns for employees of the company. The following amounts of salary entered on the forms were taken by Newhouse from the W-2 forms of the company: Year
Salary
1944
$2,850.36
1945
2,795.06
1946
2,769.47
1947
3,001.30
1948
3,370.84
Newhouse asked Mathias, as he filled in each 1040 form, whether he had any income from any source in addition to his salary for the years 1944 through 1948 and was verbally informed of only the following items which he then entered on the forms: Year
1947
Rents, Loss
($299.91)
1948
Income from Rents
$502.56
1948
Capital Gains
608.24
Mathias, in answer to specific questions from Newhouse on interest and dividend income, said he had no interest or dividends to report and Newhouse placed X's in the appropriate blanks to indicate those questions *272 had been asked and not missed. Mathias did not report on his income tax returns for 1944 through 1949 any of the money which he received through Ruth from the sale of the galvanized ware to Bell. The Commissioner, in the deficiency notices, determined that Mathias failed to report "income realized from the sale of merchandise while employed by the Cincinnati Galvanizing Company" in the following amounts: Unreported
Year
Income
1944
$ 7,166.67
1945
25,366.67
1946
25,366.67
1947
21,804.67
1948
23,685.43
1949
9,974.30
Total
$113,364.41
Mathias received income in 1944 through 1949, in the amounts thus determined by the Commissioner. A part of the deficiency for each of the years 1944, 1945, 1946, 1947 and 1949, as determined against Mathias and for the year 1948 as determined against Mathias and his wife, was due to fraud with intent to evade tax. Their return, if any, for each of the years 1944 through 1947, was false and fraudulent with intent to evade tax. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The present case, consisting of two docket numbers involving the tax liability of Mathias, and *273 another case, consisting of two docket numbers involving the tax liability of Ruth Bennett, were consolidated for the purpose of trial. A stipulation in the Ruth Bennett case was not made a part of the record in the present case. The issues in this case are decided without resort to the stipulation in the Ruth Bennett case. However, evidence properly admitted and admissible in the present case has independently established some facts which also appear in that stipulation, and the facts thus established by the evidence in this case have been considered along with the other evidence in the case. The petitioners have the burden of proof to show that the Commissioner erred in determining the deficiencies. Louis Halle, 7 T.C. 245, affd. 175 Fed. (2d) 500, certiorari denied 338 U.S. 949. Mathias claims that his admissions of October 8 and 17, 1949 were given under duress and are not true statements of the facts. The entire evidence on this point has been carefully considered and the conclusion has been reached that the statement of October 17, 1949 was voluntarily made by Mathias without any duress from any source except from his own conscience *274 and his desire to make a full confession. He had theretofore paid the company $35,000 and had received a release from the company. He was still in its employ. He reopened the matter by going to Schott and stating that he wanted to tell the whole truth. Schott then called in the detective, a typewriter was obtained, the door to the office was closed and Mathias told his story without any threat, promise or other improper act upon the part of his two listeners. The substance of what he told was typed, the typed statement was read to and understood by Mathias, it was witnessed by Schott and the detective, and Mathias left the office to take up other affairs. The precautions taken to prevent interruption shielded Mathias and were beneficial to him rather than otherwise. The typed statement fairly discloses the substance of his statement. His earlier statement of October 8, 1949 is probably not as important hereto as the later one. Mathias was undoubtedly frightened and distaught on October 8, 1949, but Schott and the detective, who were then his only listeners, did not threaten, promise, restrain, cajole, or otherwise improperly influence him on that occasion. Nevertheless, he did not *275 tell "the truth, the whole truth and nothing but the truth" in that statement and later admitted that he had not. Mathias claims that he can not be taxed on the income attributed to him by the Commissioner because he embezzled the goods rather than stole them and the Supreme Court has held in Commissioner v. Wilcox, 327 U.S. 404, that embezzled money does not constitute taxable income. The Wilcox case was limited to "its facts" by the Supreme Court in Rutkin v. United States, 343 U.S. 130. See also W. L. Kann, 18 T.C. 1032, affd. 210 Fed. (2d) 247, certiorari denied 347 U.S. 967 and United States v. Iozia, 104 Fed. Supp. 846. Cf. J. J. Dix, Inc., v. Commissioner, 223 Fed. (2d) 436, certiorari denied 350 U.S. 894 (11-14-55). The money which the Commissioner seeks to tax as income to Mathias in the present case was not money embezzled by Mathias from his employer. Furthermore, the income is not being added by reason of the mere taking of the galvanized ware. See United States v. Iozia, supra.The goods here in question were taken by Mathias from his employer and turned *276 over to Ruth, who then sold them to Bell. The money received in payment for the goods by Ruth, which is the income being taxed, had never belonged to the Cincinnati Galvanizing Company. That money was not embezzled but was received by Ruth under claim of right, and a portion of it was then delivered by her to Mathias, who also received it under claim of right. Money received by him under such circumstances represents taxable income. Rutkin v. United States, supra. There is no merit to the petitioners' contention that the Cincinnati Galvanizing Company had a donative intent and forgave an obligation to pay it the amount received by Mathias in excess of $35,000. The company, at the time it received the $35,000, did not know that any larger amount had been received by Mathias. Cf. Commissioner v. Jacobson, 336 U.S. 28. The Commissioner, in determining the deficiencies, eliminated the $35,000 paid by Mathias and has taxed only the excess over that amount received by Mathias. Mathias nevertheless questions the amount taxed to him by the Commissioner. He has no records to show how much he received and he voluntarily admitted, shortly after the scheme was discovered *277 by his employers, that he had received amounts in excess of those taxed by the Commissioner. His evidence is quite inadequate to show the receipt of lesser amounts than those taxed by the Commissioner. The Commissioner has the burden of proof to show by clear and convincing evidence that any returns filed for the years 1944 through 1947 were false and fraudulent with intent to evade tax and that a part of the deficiency for each year was due to fraud with intent to evade tax. However, it is not necessary that his proof show the exact amount which Mathias received in each year and failed to report. It is sufficient, in relation to amounts, that the Commissioner show the receipt by Mathias of substantial amounts of unreported income in each of the years in question. Estate of W. Y. Brame, 25 T.C. - (1-19-56). Mathias had only limited education, but he had more than ample intelligence to understand exactly what he was doing at all times material hereto. He knew all along that he was receiving large amounts of money from the sale of the merchandise, which amounts of money he was not reporting on his income tax returns. The receipt of large amounts of unreported income over a long period *278 of time under circumstances as disclosed by this record is strong evidence of an intent to evade taxex. M. Rea Gano, 19 B.T.A. 518, 533; Henry C. Boucher, 18 T.C. 710. Mathias' guilty conscience is clearly disclosed by his action on October 17, 1949. The Cincinnati Galvanizing Company did not discharge him when it learned what he had been doing but for some reason continued to employ him until the spring of 1950. He had paid the company $35,000 based upon his statement of October 8, 1949, and had received a release from the company. He knew he had received much more than the admitted $35,000. He went to William Schott, the Vice President of the company, on October 17, 1949, saying he wanted to tell the whole truth and relieve his mind on the subject. Of course that action does not prove conclusively that he knew his returns were false or that he intended to defraud the Government of tax, but it does tend to prove convincingly that he knew what he had been doing was wrong. He was accustomed to file income tax returns. The returns which he filed for the taxable years are in evidence. The record as a whole justifies the findings that his returns were false *279 and fraudulent with intent to evade tax and that a part of each deficiency was due to fraud with intent to evade tax. The Commissioner, apparently in an effort to protect the revenues, made alternative determinations in regard to the year 1949. One such was that the entire net amount received by Mathias was income in the year 1949. The holding herein is that the amounts were income in the years in which they were received. Decisions will be entered under Rule 50. Footnotes
*. Joint return of Mathias and Susie Schira.↩