MICHAEL J. BERARDO AND ANNAMARIA BERARDO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Berardo v. Commissioner
Docket No. 21022-85
United States Tax Court
T.C. Memo 1987-433; 1987 Tax Ct. Memo LEXIS 430; 54 T.C.M. (CCH) 344; T.C.M. (RIA) 87433; August 27, 1987. Barry A. Furman and Alan M. Bredt, for the petitioners. Alan E. Cobb, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, JUDGE: Respondent determined a deficiency in petitioners' individual income tax for 1978 in the amount of $ 51,913 and an addition to the tax under section 6653(a)[1] in the amount of $ 2,596. The issues for decision are (1) whether petitioners have sustained a theft loss in 1978 and, if so, the amount of any such theft loss; (2) whether a $ 60,000 payment received by petitioners *431 in 1978 is includable in income; and (3) whether the petitioners are liable for additions to the tax for negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and exhibits thereto are incorporated herein by reference. Petitioners resided in Philadelphia, Pennsylvania, at the time they filed their petition. On their 1978 joint Federal income tax return petitioners claimed an itemized deduction for a theft loss of $ 85,000, this amount representing the net of a claimed theft of $ 145,000 and a recovery of $ 60,000. In the statutory notice of deficiency, respondent disallowed the $ 85,000 theft loss deduction on the basis that petitioners failed to establish that a deductible loss had been sustained pursuant to section 165(a). Respondent also determined that petitioners' taxable income should be increased by $ 60,000 for a deposit *432 made to petitioner Michael Berardo's checking account and that petitioners were liable for additions to the tax pursuant to section 6653(a) for negligence or intentional disregard of rules and regulations. Without objection by respondent, petitioners filed an amended petition that alleged an additional theft loss of $ 87,500. Petitioners continued to maintain that the $ 60,000 deposit was a recovery of money lost by theft. The amended petition asserted total thefts of $ 227,500 less a recovery of $ 60,000, for a net loss of $ 167,500. [2]
During 1978 petitioner Michael Berardo (hereinafter referred to as petitioner) had been in the restaurant business for several years and owned a restaurant doing business as Sparns Seafood House. Sparns Seafood House was incorporated under the name 334 Corporation. Sometime during 1975 or 1976 petitioner was introduced at his restaurant to *433 Edward Malakoff. Malakoff was a trustee for the Bankruptcy Court, an appraiser, and owner of a realty company, Murray Realty Company. Malakoff became a frequent customer in petitioner's restaurant and in 1976, on petitioner's behalf, searched for and located several potential new locations for petitioner's restaurant. In April 1977 Malakoff approached petitioner with a proposal that both of them make an investment in real estate. On May 4, 1977, petitioner drew a check in the amount of $ 12,500 to Murray Realty Company for an interest in a parcel of realty that, according to Malakoff, was located in Akron, Ohio (the "Akron property"). Soon after petitioner invested in the Akron property, Malakoff represented to petitioner that the Akron property had been sold at a gain, but that they "had to wait" and "could not do anything for nine months because of the capital gains." On May 27, 1977, petitioner drew another check to Murray Realty Company in the amount of $ 17,500, representing an investment in a parcel located in Salisbury, North Carolina (the "Salisbury property"). In June or July of that year, Malakoff approached petitioner regarding a third investment. Malakoff represented *434 to petitioner that the third investment involved approximately 40.5 acres located on Baltimore Pike in Delaware County, Pennsylvania (the "Baltimore Pike property"). Petitioner introduced to Malakoff three persons as potential investors in the Baltimore Pike property - G. Fred DiBona, Jr., Dr. Frederick C. Hawkins, and Dr. Norman Zazow. In connection with the investment in the Baltimore Pike property, Malakoff sent to the investors copies of (1) an escrow agreement from a title insurance company for the money the investors had paid either to Malakoff or to Richard Realty Company (another company in which Malakoff was involved); (2) a letter from Richard Realty acknowledging the receipt from six investors of $ 100,000 in total, including $ 25,000 from each petitioner and Malakoff, $ 15,000 from Dr. Hawkins, and $ 10,000 from Dr. Zazow; (3) an Agreement of Sale for Richard Realty to purchase the Baltimore Pike property; (4) a letter from Federated Department Stores ("Federated") and an attached Agreement of Sale regarding Federated's purchase of the Baltimore Pike property from Richard Realty; and (5) a second agreement between Richard Realty and Federated whereby Federated assigned *435 its rights in the Baltimore Pike property to another corporation. Malakoff signed all of the foregoing documents with respect to the Baltimore Pike property as president of Richard Realty Company. The investors were also sent a photocopied page containing the faces of three checks purportedly paid into escrow. The purported checks were payable to Commonwealth Land Title Insurance Co. (Commonwealth Title), drawn on a Murray Realty account, and signed by Malakoff. The purported checks totaled $ 100,000, the total amount paid by the investors according to the aforementioned letter to them from Richard Realty. The purported checks were never cashed, and Commonwealth Title neither received any money nor entered into any escrow arrangement for the Baltimore Pike property. The agreements purportedly made with Federated were also fraudulent. In September or October 1977 Malakoff again approached petitioner, this time concerning an investment property purportedly located on Market Street in Philadelphia (the Market Street property). Petitioner introduced Robert Mattei, the manager of his restaurant, and Mario Froio, a close friend of petitioner's, to Malakoff so that they also might *436 invest in the Market Street property. In regard to the Market Street property, Malakoff sent to petitioner copies of documents similar to those sent regarding the Baltimore Pike property. One document was a letter from Murray Realty to the investors that acknowledged receipt of the funds and represented that the receipts had been escrowed. That letter, inter alia, stated that: The respective interests into this transaction and this sum deposited are as follows: Edward Malakoff
35%
($ 87,500)
Mike Berardo
35%
($ 87,500)
Robert D. Mattei
20%
($ 50,000)
Marion [sic] Froio
10%
($ 25,000)
At the bottom of the letter was the following: We, the respective parties of interest, do likewise approve this letter this 21st Day of December, 1977.    (seal)   (seal)   (seal)
Malakoff's signatures (both personally and as president of Murray Realty) were shown on the copy of this letter that petitioner entered into evidence; however, there were no signatures for any of the other three investors. On or about June 12, 1978, petitioner deposited in his personal checking account $ 60,000 that he had received from Malakoff. *437 In July 1978 Mattei discussed the investment in the Market Street property with and showed a copy of the agreement to a friend of his, Sidney Baer, who suspected that the deal was fraudulent. Baer called Commonwealth Title, the purported escrow agent for the amounts invested in both the Baltimore Pike property and the Market Street property. Commonwealth Title stated that it had never received any money in escrow from Malakoff for either investment. On the day following Baer's call to Commonwealth Title, petitioner received from Malakoff the following typewritten note (obviously typed in haste) containing a July 26, 1978, Philadelphia postmark: Dear Mike: This is a hard letter to write because I did a te-rible thing. Presssures and dircumstances made me pyramid and pyramid. I am deeply in debt . . . probably well over $ 600,000 and the banks, the courts and everyone is going to be loooking for me. The deals we were in were fabrications. At least I got you back $ 60,000 which you should not tell anyone about as they may try to take it away on saome basis. I lied, I cheated and I have no excuse. I did not try to hurt you. I got caught in circumstances which I *438 wrongly thought were beyond my contrrol and instead of facing them I was a coward and pyramided and ran. Ed [Copied as written.] Malakoff disappeared on July 27, 1978, and has not been found since, even though both the F.B.I. and the United States Attorney's Office investigated his disappearance. When Malakoff disappeared, the following unaddressed typewritten note (on Murray Realty letterhead) was found by one of his business partners: I am writing this letter as it is the end of my life and I must disappearl [sic]. I have made one both [sic] after the other and while in my heart I tried to do good, in reality I did just the opposite. Those I cared about most I have hur [sic] the most. As far as money is concerned, those that really got hurt were the banks and institutions that could afford it. Others lost paper and some cash profits, but the real loss was well over $ 600,000 and the major people were the banks etc. I know that I am stupid. I know that I did not face reality and that I pyramided instead of facing facts. But I did it and must pay the consequences. Saying I am sorry does nothing and means nothing. Please do not try to find me or *439 look for me. I will never be found or located. Let it stay just that way. Ed On the day that Malakoff disappeared, Mattei, Froio, and petitioner brought an action against Malakoff in the Court of Common Pleas of Philadelphia County, Pennsylvania, and obtained a preliminary injunction on that day to restrain Malakoff from withdrawing any funds from any bank or savings institution. Soon thereafter, petitioner brought a complaint for confession of judgment against Malakoff on a promissory note in the amount of $ 87,500. The note was signed by Malakoff as maker and dated December 21, 1977, the date of Malakoff's letter to the investors regarding the Market Street property. The note was due on or before August 31, 1979, and bore the notation that it was "not to be recorded unless in default 8/31/79." Petitioner has not recovered any money through either of the suits. OPINION This case is primarily one of substantiation. In his brief respondent concedes that "if petitioner gave money to Malankoff [sic] to invest in real estate transactions * * *, petitioner's loss qualifies as a theft loss under Pennsylvania law which is deductible under I.R.C. section 165(c)(3) *440 . The controversy is the amount of the loss * * *." [3] Respondent asserts that petitioner has failed to establish that he has sustained any theft loss whatsoever. Respondent also asserts that the June 1978 deposit of $ 60,000 to petitioner's checking account represented money transferred by Malakoff to petitioner for an investment on behalf of Malakoff in a microfilm company in which petitioner was involved. As such, according to respondent, the $ 60,000 deposit represents misappropriation funds and is taxable income to petitioner. *441 Petitioner asserts that he has personally invested in the four properties, as well as made payments for others' shares of the investments in those properties, all in reliance on Malakoff's representations. The amounts that petitioner contends he has paid are summarized as follows: Party For
Property
Whom Money Invested
Amount
Akron, Ohio
Berardo  $ 12,500
Salisbury, North Carolina
Berardo  $ 17,500
Baltimore Pike
Berardo  25,000
Baltimore Pike
Dr. Zazow
10,000
Market Street
Berardo  87,500
Market Street
Mattei   50,000
Market Street
Froio    25,000
Total    $ 227,500
Petitioner contends that he paid for Dr. Zazow's original investment in the Baltimore Pike property with the understanding that Dr. Zazow needed only to repay him the $ 10,000, without interest. Petitioner testified that the understanding was that Dr. Zazow was to keep any profits on the deal, while petitioner would "sustain" any losses. Petitioner also contends that he gave $ 50,000 to Mattei to pay for Mattei's share of the investment in the Market Street property under terms similar to those regarding the payment for Dr. Zazow. *442 Petitioner testified that he forwarded the money for Dr. Zazow and Mattei because he felt the property deals were "sure" investments. Petitioner also contends that after Malakoff disappeared, petitioner reimbursed Froio for Froio's $ 25,000 investment in the Market Street property. Petitioner's final assertion is that the $ 60,000 he received from Malakoff in June 1978 was a return of some of the funds he had invested in the four properties and, as such, should be offset against his claimed theft losses rather than included as an additional item of income. Thus, petitioner asserts that he has incurred a net theft loss of $ 167,500 due to the "Ponzi" scheme perpetrated by Malakoff. [4]
Petitioner bears the burden of proving that respondent's determination is incorrect and that he is entitled to the deduction at issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142. Petitioner also bears the burden of proving that the $ *443 60,000 was obtained from a nontaxable source or in a nontaxable manner.[5] We find that petitioner has not met this burden except to the extent of the $ 30,000 for which he has two cancelled checks. PAYMENTS TO MALAKOFF
In the record before us, there are no cancelled checks, bank statements, copies of certified checks, cashiers checks, or money orders, or any other written evidence that petitioner ever transferred more than $ 30,000 of his funds to Malakoff or Malakoff's realty companies. Thus, petitioner has no written corroboration for $ 197,500 of his claimed payments. Petitioner testified that he did not remember how he paid Malakoff, whether by cashier's check, cash, or some other way. It is incredible that a businessman such as petitioner, whose total income from his business was about $ 80,000 in 1978, would not remember more of the specifics regarding payments made by him of almost $ 200,000 within a twelve month period. As an explanation for petitioner's inability to remember, respondent suggests that another sequence of events might explain petitioner's dealings with Malakoff. Respondent *444 submits that the $ 30,000 invested by petitioner in the first two transactions was rolled over into the later two transactions, together with "paper profits" and that petitioner, believing he had made a quick profit, persuaded his friends to invest in the third and fourth transactions. The friends would put up the new money to make the scheme work and petitioner would only have to put up his original $ 30,000 plus his paper profits from the first two transactions. Respondent asserts that this scenario explains why petitioner could only produce cancelled checks for $ 30,000, and would further explain the note found by Malakoff's partner in which Malakoff says that only banks and institutions lost money and that others lost only paper and cash profits. Respondent also suggests that this scenario would account for the proceeds from the "sale" of the Akron property, which supposedly was sold soon after petitioner's investment in it. Even if petitioner truly did not remember the particulars about his payments, he nonetheless bears the burden of convincing the Court that respondent's determination is incorrect and that he is entitled to the deductions. Petitioner testified that *445 he searched his records and was unable to find other cancelled checks, and that he called his bank and inquired whether it might have any information regarding his account. He testified that the bank told him that it "can only go back to January of 1979," and thus could not provide any evidence regarding the investments that would have been made in 1977. We cannot attach much significance to such uncorroborated testimony. Petitioner could have offered the testimony of a representative from the bank to corroborate his assertion but he did not. Petitioner's uncorroborated testimony regarding the bank's policy is not convincing, especially when he so easily could have introduced evidence to substantiate his naked assertion. Also, even if the bank had destroyed its records, there remains petitioner's duty to maintain and retain appropriate records. Sec. 6001; sec. 1.6001-1(a) and (e), Income Tax Regs. Petitioner's duty is not discharged simply because another party also might have other copies of the records. Petitioner has introduced as evidence to substantiate his investments copies of several documents relating to the Baltimore Pike property and the Market Street property. *446 Most of these documents are simply fraudulent agreements purportedly made among an acknowledged swindler, Malakoff, and third parties, and are not convincing with respect to the issue of the amount of funds petitioner paid to Malakoff. There are, however, two letters (both on Murray Realty letterhead) to the investors in the Baltimore Pike property and the Market Street property that acknowledge receipt of funds from the investors and recite the agreements between Malakoff and the investors. The letters are signed by Malakoff both as president and sole stockholder of Richard Realty and as personal guarantor of the agreements; however, there are no signatures from any of the investors on the lines at the end of the letter where they were to signify their approval of the agreement. The absence of these signatures might not be significant if the only issue was how much petitioner paid for his personal investments in the deals. However, petitioner also asserts that he has paid for others' shares of the investments, and this court requires evidence that payments were actually made for or by the other parties (assuming arguendo that such payments would give rise to losses deductible *447 by petitioner). Their signatures on the agreements might have constituted such evidence. The lack of such signatures leaves that requirement unsatisfied. Testimony of Dr. Zazow, Mattei, or Froio could be helpful in determining whether payments were made for or by them to Malakoff and ultimately by petitioner. Froio did testify at trial that he recovered his $ 25,000 investment in the Market Street property from petitioner; however, his testimony was not credible. He was not positive when he paid Malakoff, whether he paid with one or more checks, from what accounts the funds for the investment came, or whether he even could have had sufficient funds to make the investment in the first place. Furthermore, Froio was not positive how he handled the $ 25,000 that he said was repaid to him by petitioner, his good friend of eighteen years. In short, because Froio was so uncertain regarding his investment with Malakoff and because the record contains no reliable independent corroborating evidence (e.g., a cancelled check) that Froio invested in the Market Street property or that petitioner refunded money to Froio, we find that petitioner has not proved that respondent's disallowance *448 of $ 25,000 for the payment to Froio was incorrect. Dr. Zazow and Mattei were originally listed as witnesses for the trial, but were not in court on the first afternoon of the trial "because of a funeral." There is nothing in the record to explain why petitioner did not call them on the next day of trial. For whatever reason, there is no corroboration that petitioner paid Malakoff funds representing an investment for either Dr. Zazow or Mattei. In fact, in petitioner's Exhibit 19, a Form 886-A (Explanation of Items) prepared by the revenue agent who originally examined petitioner's return, the agent notes that he interviewed Mattei and that Mattei refused to acknowledge any advance of funds from petitioner. We are not required to accept petitioner's self-serving assertions that he paid the funds on behalf of Dr. Zazow or Mattei, especially where there is no independent evidence to corroborate the asserted payments. See Jackson v. Commissioner,19 T.C. 133, 145 (1952), affd. 207 F.2d 857 (10th Cir. 1953). Thus, we find that petitioner has not proved that he is entitled to a theft loss deduction for the $ 60,000 he claims that he paid Malakoff *449 on behalf of Dr. Zazow and Mattei.[6]
Petitioner has entered into evidence a copy of a complaint filed by him in the Court of Common Pleas of Philadelphia County on August 2, 1978, a few days after Malakoff disappeared. The complaint is a confession of judgment against Malakoff on a promissory note in the amount of $ 87,500. The note represents the amount of petitioner's share in his investment in the Market Street property and is dated December 21, 1977, the same date as Malakoff's letter agreement to all of the investors in the Market Street property. We note that the judgment was obtained in a default proceeding wherein the noteholder's attorney was authorized by a clause in the note to confess judgment against Malakoff. We also note that the record before us does not show that any Pennsylvania state court judge ever considered the complaint. Rather, the confession of judgment was submitted pursuant to rule 1951 et seq. of the Pennsylvania Rules *450 of Civil Procedure. [7]Rule 2951 et seq. allows a creditor to obtain a judgment on a note in an ex parte proceeding before a prothonotary. In Pennsylvania a prothonotary is analogous to a clerk of court, except that the duties of prothonotaries extend generally to civil matters wile clerks of court generally are responsible for criminal matters. See 42 Pa. Cons. Stat. Ann. secs. 2731 et seq. and 2751 et seq. (Purdon 1981). [8]
While neither party raised the issue, our reading of the complaint for judgment filed by petitioner and of the applicable Pennsylvania laws then in effect leads us to believe that the confession of judgment was obtained by petitioner in a perfunctory proceeding, with little more formality than would be found in the simple recording of a deed -- certainly not an adversarial proceeding. A contested *451 proceeding would carry greater weight in establishing the validity of the debt than the ex parte proceeding in evidence here. While the confession of judgment may have proved that a valid debt existed between petitioner and Malakoff, it still does not persuade us that petitioner ever paid to Malakoff the amount stated on the note because Malakoff had no chance to contest petitioner's claim and petitioner, when he filed the complaint, knew quite well that Malakoff would not be available to disagree with any claim petitioner might choose to assert. In short, the confession of judgment does not establish that petitioner paid $ 87,500 to Malakoff. It is equally plausible that the debt existed because of unpaid profits due petitioner from Malakoff. [9]
Even when taken together, petitioner's testimony, the judgment on the promissory note, and the documents generated by Malakoff do not convince us that petitioner has ever transferred more than $ 30,000 of his own money to Malakoff or to anyone else pursuant to Malakoff's pyramid scheme. Although we may *452 not be convinced that the scenario suggested by respondent necessarily represents the truth regarding the transactions at issue, we are not called upon to make such a determination. We only need to determine whether petitioner has carried his burden that respondent's disallowance of his deduction was improper. A review of all the evidence presented to us leads us to conclude that respondent's scenario seems equally as plausible as petitioner's. Thus, we hold that petitioner has shown that he is entitled to a deduction for a theft loss only in the amount of $ 30,000. RECEIPT OF $ 60,000 FROM MALAKOFF
Petitioner's assertion that his receipt of the $ 60,000 from Malakoff should not be taxable income is more convincing than his arguments regarding his payments to Malakoff. Had petitioner's testimony been consistent with his pleadings, we might have found in his favor on this issue. [10] Petitioner's testimony on direct examination suggests that the $ 60,000 check from Malakoff was intended to be used to purchase an investment for Malakoff in a microfilm company in which petitioner had become involved.[11] If that were the case, the $ 60,000 would be unrelated to the real estate *453 dealings between petitioner and Malakoff. In that event the $ 60,000 would represent funds misappropriated by petitioner from Malakoff that are taxable income to petitioner because petitioner has not shown that he ever forwarded the $ 60,000 to the microfilm company. Rutkin v. United States,343 U.S. 130, 137 (1952). *454 Although Malakoff's letter of July 27, 1978, to petitioner implies that the $ 60,000 was intended as a repayment of petitioner's investments in the real estate deals, the record does not establish whether whether the $ 60,000 was intended to be a return of petitioner's investment, which would be nontaxable, or whether the money represented taxable income. Petitioner has the burden of proving that the $ 60,000 is not taxable income. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We find that petitioner has failed to prove that respondent's determination is incorrect. Accordingly, we hold that the $ 60,000 is taxable income to the petitioner in 1978. NEGLIGENCE ADDITION
The final issue is whether petitioner is liable for the addition to tax pursuant to section 6653(a). [12]In order to avoid the addition to the tax under 6653(a), the burden is on petitioner to show that no part of the underpayment of income taxes were due to his negligence or intentional disregard of rules and regulations in preparing his tax return. Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), *455 affg. on this issue a Memorandum Opinion of this Court; Bixby v. Commissioner58 T.C. 757, 791 (1972). Section 1.6001-1(a), Income Tax Regs., provides that "any person subject to tax * * * shall keep such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." Our decision in this case rests on the fact that petitioner did not have sufficient documentary evidence to prove that respondent's *456 determination was incorrect and that the positions petitioner took on his tax return were correct. Petitioner was remiss in his bookkeeping responsibility and his duty to maintain adequate records. Petitioner was a businessman, and we believe that a reasonably prudent businessman would have kept better records. Therefore, we find that the insufficiency of his records and supporting documentation was due to petitioner's own negligence and that he is liable for additions to the tax under section 6653(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners' original petition did not set forth in detail the composition of the original $ 145,000 total theft claimed; however, the amended petition set forth itemized losses totaling $ 227,500. The apparent difference of $ 5,000 between the petition and the amended petition is unexplained. ↩
3. SEC. 165. LOSSES. (a) General Rule. -- There shall be allowed as deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -- In the case of an individual, the deduction under subsection (1) shall be limited to -- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty or from each theft, exceeds $ 100. * * * (e) Theft Losses. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. ↩
4. See Cunningham v. Brown,265 U.S. 1↩ (1924), for a description of a similar pyramid scheme effectuated by Charles Ponzi. 5. See Sauer v. Commissioner,T.C. Memo. 1965-236↩. 6. We find that petitioner has not proved that he ever made payments on behalf of Froio, Dr. Zazow, or Mattei; thus, we do not reach the issue of whether such payments, even if made by petitioner, would be deductible by him. ↩
7. Rule 2951 et seq. of the Pennsylvania R.C.P. went into effect in 1970 and is unchanged since. ↩
8. These Pennsylvania Code provisions were last amended in 1978 and were effective as of June 27, 1978, several weeks before petitioner filed his suit on August 2, 1978. ↩
9. Petitioner in his testimony did not even offer an explanation of the purpose of the indebtedness between Malakoff and him. ↩
10. Paragraph 5(f) of the Amended Petition states: On or about June 13, 1978, Malakoff returned to Petitioner $ 60,000 of the funds Petitioner had invested with Malakoff. ↩
11. Petitioner's testimony was as follows: Q: Exhibit 20 speaks of $ 60,000. You did receive $ 60,000 from Mr. Malakoff which you reported on your income tax return to reduce the amount of the theft loss, did you not? * * * Petitioner: Counselor can I answer that please? I did receive $ 60,000. It had nothing to do with the agreement or the thing. I was involved with a microfilm company and I asked Mr. Malakoff if he would like to invest some money; I was going to become the secured creditor for the company. They did mostly government work. One was in Oak Ridge, Tennessee, one in Philadelphia. It employed 450 to 500 people and one in Maryland. The money was for $ 60,000 was for that. It was not really. When I went to my accountant, I just wiped off $ 60,000, the first $ 60,000 that I lost. the $ 87,000 was pending so I didn't take a loss on it. This testimony is inconsistent with petitioner's explanation in his pleadings of the receipt of the $ 60,000. ↩
12. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. ↩